**FIDELITY & GUARANTY INSURANCE UNDERWRITERS, INC. and Gisela Armstrong, Appellants,**

v.

**Corina SAENZ and Felipe Saenz, Jr., Appellees.**

No. 13–91–029–CV.

Court of Appeals of Texas, Corpus Christi.

July 29, 1993.

Rehearing Overruled Nov. 30, 1993.

104

W. Wendell Hall, Fulbright & Jaworski, San Antonio, Ben Taylor, Fulbright & Jaworski, Houston, for appellants.

W. Charles Campbell, James P. Wallace, Thomas Black, Soules & Wallace, Austin, Dalinda G. Quintana, Ramon Garcia, Law Office of Ramon Garcia, Edinburg, for appellees.

## OPINION

KENNEDY, Justice.

Appellants, Fidelity & Guaranty Insurance Underwriters, Inc. and Gisela Armstrong, appeal from a judgment in favor of appellee, Corina Saenz, in a lawsuit arising from appellants' actions during settlement of Saenz's claim for workers' compensation. By the lawsuit, Saenz claimed that Fidelity, when settling her workers' compensation claim, breached its duty of good faith and fair dealing, committed fraud, and violated the Insurance Code and the Deceptive Trade Practices Act. We affirm in part, reverse and render in part, and reverse and remand in part.

On February 3, 1986, while working at Phillips Properties, Corina Saenz fell over backwards in a chair and hit her head on the floor. Following the incident, she suffered nausea, headaches, and seizures. Saenz filed a claim for compensation benefits under the Texas Workers' Compensation Act.[1] Fidelity was Phillips Properties' workers' compensation carrier. Fidelity immediately began paying weekly benefits to Saenz. Gisela Armstrong was Fidelity's "telephone adjuster" in charge of Saenz's case.

In February 1987, while continuing to pay Saenz weekly benefits, Fidelity requested a prehearing conference before the Industrial Accident Board (IAB) and a meeting was scheduled for April 8, 1987. A week before the conference, Saenz telephoned the IAB and stated that Fidelity made a settlement offer to her of $64,000 plus five years future medical expenses but that she wanted more future medical benefits. The IAB representative advised Saenz to attend the scheduled conference and told Saenz that her appearance at the conference would not obligate her to take the offer. Saenz appeared at the prehearing conference without an attorney.

The conference resulted in Saenz and Fidelity executing an IAB Form 13, Compromise Settlement Agreement (CSA). The CSA resolved Saenz's claims for weekly compensation indemnity benefits as well as future medical benefits. The agreement provided that Fidelity would pay Saenz $65,000 in a lump sum and would pay reasonable and necessary medical expenses limited to Dr. J.A. Zavaleta or at his referral until April 8, 1992. Just above Saenz's signature was the following statement:

> The undersigned agrees that the liability of the above insurance company or self insured or the extent of the injury is uncertain, indefinite or incapable of being satisfactorily established.

The IAB approved the CSA on April 14, 1987. In its approval order, the IAB made the express finding:

> The Board finds the liability of the insurance company or self insured or the extent of the injuries of the employee, is uncertain, indefinite, and incapable of being satisfactorily established. It is ordered that the compromise agreement be, and same is hereby, approved.

Following her acceptance of the settlement, Saenz sued Fidelity claiming breach of the duty of good faith and fair dealing in settlement practices, and violations of the Insurance Code and the Deceptive Trade Practices Act. Later, Saenz amended her petition alleging fraudulent misrepresentation. On May 30, 1990, Saenz again amended her petition to include Armstrong, in her individual capacity, as a defendant. Saenz contended that Fidelity, through its agent, Armstrong, represented to her that five years was the maximum future medical benefits she could receive under the law, and claimed that Armstrong discouraged her from consulting with an attorney. Saenz contends that at the time Armstrong made the offer to her, Armstrong was aware that Saenz was entitled to greater medical benefits than the five years offered.

At trial, the jury found that Fidelity ratified Armstrong's malicious, knowing, and

---

1. *See* Tex.Rev.Civ.Stat.Ann. art. 8306, *et seq.* (Vernon 1967). Following 1989 Acts, disposed to Tex.Rev.Civ.Stat.Ann. art. 8308, *et seq.* (Vernon Pamph.1992).

fraudulent misrepresentation of the workers' compensation policy benefits to Saenz which the jury found proximately caused Saenz's damages. The jury also found that Fidelity breached its duty of good faith and fair dealing in handling Saenz's claim and the breach was the proximate cause of damages to Saenz. The trial court rendered judgment on the verdict and Saenz recovered actual and punitive damages against Armstrong and Fidelity.

## Fraudulent Misrepresentation

■ Saenz contends that Fidelity committed common law fraud when negotiating the CSA. Specifically, Saenz contends that Fidelity acted fraudulently when Armstrong represented to her that, under the law, the maximum medical benefits she could receive was five years of medical costs for all reasonable and necessary expenses. Saenz explained that she signed the CSA, in which she agreed that the extent of her injury was uncertain, only because Armstrong told her that five years of medical expenses was the maximum she could receive under the law. The jury agreed and found that Armstrong fraudulently misrepresented the benefits provided under the workers' compensation insurance policy which proximately caused Saenz damages.

By points four and seven, Fidelity asserts that the court's jury charge was erroneous. Fidelity asserts that the only remedy available on a cause of action based on fraud in negotiating a workers' compensation CSA is a suit to rescind the CSA. Fidelity continues its argument by contending that because rescission is the only remedy available to Saenz, the court reversibly erred by submitting a charge which failed to properly submit the necessary elements to set aside a CSA approved by the IAB. By point seven, Fidelity contends that Saenz waived her rescission remedy by failing to seek the rescission remedy in the trial court's judgment.

Fidelity argues that since Saenz's fraud action is raised regarding the negotiation of a CSA approved by the IAB, Saenz must first file suit to set aside the agreement. Fidelity cites as authority for its proposition *Brannon v. Pacific Employers Ins. Co.*, 148 Tex. 289, 224 S.W.2d 466, 469 (1949) (citing *Commercial Casualty Ins. Co. v. Hilton,* 126 Tex. 497, 87 S.W.2d 1081 (Comm'n App.1935), *rehearing denied with opinion,* 126 Tex. 497, 89 S.W.2d 1116 (Comm'n App.1936)). Fidelity contends that once a CSA is approved, it is binding on all parties until legally set aside in a court of competent jurisdiction by an independent affirmative action. *Rodriguez v. American Gen. Fire & Casualty,* 788 S.W.2d 583, 585 (Tex.App.—El Paso 1990, writ denied); *Gayler v. Renfro,* 576 S.W.2d 911, 913 (Tex.Civ.App.—Amarillo 1979, no writ). Fidelity asserts that before setting aside a CSA, a claimant must show that misrepresentations about injuries were made by the employer or compensation carrier; that the claimant relied on those misrepresentations in making the settlement; and that there was a meritorious claim for more compensation than was paid. *Rodriguez v. American Home Assurance Co.,* 735 S.W.2d 241, 242 (Tex.1987) (citing *Brannon,* 224 S.W.2d at 468 (Tex.1949)).

Fidelity continues its argument that in a *Brannon*-based suit, the court does not have jurisdiction to grant judgment for the claimant for additional compensation, but rather, can only grant the worker relief by canceling the CSA. *Brannon,* 224 S.W.2d at 469. Fidelity asserts that after filing an action for rescission, Saenz must then go back to the IAB and argue her claim, and then if either party is dissatisfied with the Board's award, Saenz could appeal the CSA to the district court. *Id.* Although this results in trying the case by piecemeal, a suit for rescission, must be tried that way or not at all. *Id.*

Saenz contends on appeal that her claim is entirely distinguishable from *Brannon* and *Hilton* and that rescission is an inappropriate remedy. Saenz argues that unlike *Brannon,* her claim is for damages separate and distinct from her work-related injury. Saenz posits that *Brannon* only addresses claims whereby the plaintiff seeks to increase its compensation for work-related injuries. Saenz argues that she is not urging the *Brannon*-type of rescission claim. She stresses that she is not seeking to increase compensation for her work-related injury, but rather, is seeking to recover damages for

injuries unrelated to the head injury addressed by her compensation claim.

We agree that this is not an action for additional workers' compensation benefits. Rather, it is a suit filed asking for recovery of damages completely unrelated to the workers' compensation injury. The actionable injury complained about here results from Fidelity's alleged misrepresentation of recoverable medical benefits. We conclude that the court was not required to submit issues to the jury about rescission of the IAB-approved CSA. Therefore, we overrule appellants' fourth and seventh points of error.

### Evidence of Fraud

Question 1 of the court's charge to the jury asked:

Did Gisela Armstrong misrepresent the benefits provided under the workers' compensation insurance policy carried by Corina Saenz' employer?

Your are instructed that the terms "misrepresent" or "misrepresentation" are defined as any of the following acts of omissions:

1. Any untrue statement or a material fact; or

2. Any omission to state a material fact necessary to make the statements made (considered in light of the circumstances under which they are made) not misleading; or

3. The making of any statement in such a manner or order as to mislead a reasonably prudent person to a false conclusion of a material fact; or

4. Any misstatement of future medical benefits claimant would be entitled to under the Texas Workers' Compensation Act.

The jury answered this question *yes*.

Question two of the court's charge to the jury asked:

Were the misrepresentations, if any, made by Gisela Armstrong to Corina Saenz fraudulent?

You are instructed that to show that a statement was fraudulently made, it must be shown that:

1. A material representation was made;

2. That it was false;

3. That when made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion;

4. That the speaker made it with the intention that it should be acted upon;

5. That a party acted in reasonable reliance upon it; and

6. Thereby suffered damages.

The jury answered *yes*.

Fidelity, by its fifth point, contends that there is no evidence or that the evidence is factually insufficient to show that any statement by Armstrong, Fidelity's adjustor, constituted an actionable fraudulent misrepresentation. Additionally, by point six, Fidelity contends that there is no evidence or factually insufficient evidence that any misrepresentation by Armstrong was a proximate or producing cause of damages to Saenz. Fidelity contends that for the reasons asserted by these two points, the trial court erroneously overruled their motions for judgment n.o.v. and for new trial.

 To support an action for fraudulent misrepresentation, a statement must be represented as a material fact. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983). The elements of actionable fraud are 1) that a material misrepresentation was made; 2) that it was false; 3) that, when the speaker made it, he knew it was false or made recklessly without any knowledge of its truth and as a positive assertion; 4) that the speaker made the statement with the intention that it be acted upon by the party; 5) that the party actually acted in reliance upon it; and 6) that the party suffered injury. *Id.* (quoting *Wilson v. Jones*, 45 S.W.2d 572, 574 (Tex. Comm'n App.1932, holding approved)).

 Pure expressions of opinion are generally not actionable as fraud. *Id.* Also, generally, misrepresentations involving a point of law will not support an action for fraud. *FINA Supply, Inc. v. Abilene Nat'l Bank*, 726 S.W.2d 537, 540 (Tex.1987). However, there are exceptions to these rules and there are instances when statements of opin-

ion or misrepresentations about a point of law can rise to the level of fraud. *Id.*

These exceptions are that a party having superior knowledge, who takes advantage of another's ignorance of the law to deceive the person by studied concealment or misrepresentation, can be held responsible for the statement. *Id.* Second, misrepresentations involving a point of law will be considered misrepresentations of fact if they were intended and understood as such. *Id.* Third, a claim for fraudulent misrepresentation about a point of law may be asserted when there is a fiduciary or confidential relationship of trust between the parties. *Id.*

Saenz argues that Fidelity's adjustor, Armstrong, misrepresented available medical benefits under the Workers' Compensation Act to her, i.e., that she could get no more than five years future medical expenses. Fidelity asserts that Saenz never claimed she relied on Armstrong's statement, a necessary element of common law fraud. Also, Fidelity contends that the statements made by Armstrong were only opinions about the law, not actionable fraudulent misrepresentations of fact. Saenz responds that the evidence shows just the opposite. We review the evidence to determine whether it supports the jury's findings that Armstrong made an actionable fraudulent misrepresentation which proximately caused damages to Saenz.

In reviewing an attack on the legal sufficiency of the evidence or a "no evidence" point, we consider only the evidence and reasonable inferences that tend to support the jury findings, and disregard all evidence and inferences to the contrary. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.,* 774 S.W.2d 666, 668 (Tex.1989). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989).

In reviewing an attack on the factual sufficiency of the evidence, we consider, weigh, and examine all of the evidence which supports and which is contrary to the jury's determination. *Plas–Tex, Inc. v. United States Steel Corp.,* 772 S.W.2d 442,

445 (Tex.1989) (citing *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986)); *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986). Having done so, we should set aside the verdict only if the evidence standing alone is too weak to support the finding, or the answer is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

The evidence at trial showed that Corina Saenz had several conversations with Armstrong. During these conversations, Saenz told Armstrong that she wanted workers' compensation to pay her lifetime medical benefits resulting from her head injury. Armstrong testified that Saenz made it clear to her that she wanted lifetime medical benefits. Saenz testified that Armstrong told her over the telephone that the most workers' compensation would pay her as future medical benefits was five years. Armstrong testified that she never represented to Saenz that under the law all that she was entitled to was five years of medical benefits. Saenz testified that she mentioned to Armstrong that perhaps she should get an attorney, to which Saenz contends Armstrong responded, that she did not need an attorney because whether she got a lawyer or not, the settlement amount would be the same, and that Saenz would just have to pay the lawyer 25% out of the settlement. Armstrong testified that at no time did she ever discourage Saenz from contacting an attorney. Additionally, the evidence included a letter from attorneys for Fidelity to Armstrong. By this letter, the attorneys suggested to Armstrong that Saenz's case was potentially dangerous, and that efforts should be made to avoid scaring Saenz off to an attorney. From this evidence, the jury could infer that Armstrong intended the statement, that five years medical benefits was all workers' compensation would allow, as a fraudulent misrepresentation of a point of law which could be considered a misrepresentation of fact and thus actionable for fraud.

Saenz testified that she would not have signed the CSA if she had known that so

long as her disability continued Fidelity would have been obligated to pay her future medical bills relating to her head injury.

Based on the evidence, we conclude that the jury's findings regarding fraud were not manifestly unjust nor clearly wrong. Armstrong knew that Saenz wanted lifetime medical benefits, and she knew that if Saenz did not sign the CSA she could, and probably would, seek lifetime medical benefits. Armstrong knew Saenz did not have an attorney, and, based on the evidence, a jury could conclude that Armstrong represented to her that even if she had an attorney, workers' compensation would pay no more that five years medical under the law. We conclude that the evidence is sufficient to support the jury's finding that statements by Armstrong constituted actionable fraudulent misrepresentations. We overrule point five.

■ Question three of the court's charge to the jury asked:

Was such misrepresentation, if any, by Gisela Armstrong a producing cause of any damages to Corina Saenz?

The jury answered, *yes*. Question five of the court's charge to the jury asked:

Was such fraudulent misrepresentation, if any, by Gisela Armstrong a proximate cause of any damages to Corina Saenz?

The jury answered, *yes*.

By point six, Fidelity contends that there is no evidence or, alternatively, that the evidence is factually insufficient to show that any misrepresentation made by Armstrong was the proximate or producing cause of damages to Saenz. We disagree. Saenz testified that she relied upon Armstrong's statements, and would not have signed the CSA except for the representations made to her that the law did not allow her any more in the way of medical benefits other than the five years Fidelity offered in the CSA. We conclude that the evidence is sufficient to support the jury's finding that Armstrong's fraudulent misrepresentations were a proximate cause of damage to Saenz. We overrule point six.

Because we conclude that the evidence supports the fraud cause of action we decline to address appellant's points of error relating to a cause of action for the breach of the duty of good faith and fair dealing as they are not dispositive of the case. Tex.R.App.P. 90(a).

## Evidentiary Rulings

■ By point twenty-four, Fidelity contends that the trial court reversibly erred by admitting the testimony of Dr. Richard Moore. Dr. Moore testified at trial, giving his opinion about Saenz's necessary future medical care. Fidelity contends that this evidence was relevant only to Saenz's head injury. Fidelity contends and Dr. Moore testified that Saenz's head injury was the only injury he referred to in his opinion. Fidelity contends that the only purpose of Dr. Moore's testimony was to put "big numbers" in front of the jury about damages. Fidelity asserts that his testimony in no way related to the separate injury caused by Fidelity's fraudulent acts. We disagree.

The testimony elicited from Dr. Moore was relevant to showing the kind of potential medical expenses Fidelity was desirous of avoiding. Additionally, Fidelity complains that the trial court erred by not giving a limiting instruction to the jury that they should only consider Dr. Moore's testimony for that limited purpose. We note that the court's charge included in question eleven, relating to damages, the limitation that the jury not include any amount for any condition existing before or not resulting from the settlement of Saenz's workers' compensation claim. Additionally, the trial court instructed the jury that Saenz's head injury was a condition existing before and not resulting from the settlement of her workers' compensation claim. Therefore, we find no reversible error in the admission of Dr. Moore's testimony and in the court's failure to give a limiting instruction to the jury at the time Dr. Moore testified. We overrule point twenty-four.

By point twenty-three, Fidelity contends that the trial court erred by admitting Fidelity's annual statement to the State Board of Insurance. Fidelity contends that the statement was one by the defendant not produced in response to a request for production. Fidelity contends that it made a proper request

for the document. However, in reviewing the record, we find no production request asking for reports of Fidelity's financial status. We conclude that Fidelity has failed to secure a record sufficient to show that this constitutes reversible error. Tex.R.App.P. 50(d). We overrule point twenty-three.

## Damages

By point of error sixteen, Fidelity asserts that there is no evidence or that the evidence is factually insufficient to support the jury's answer to question eleven regarding settlement-related damages suffered by Saenz. In answering question eleven, the jury found that Saenz suffered damages of $50,000 past mental anguish, $200,000 future mental anguish, and $500,000 future medical care costs. Fidelity specifically contends that there is no evidence or that the evidence was factually insufficient to show 1) any past mental anguish or alternatively the sum of $50,000 as past mental anguish, 2) $200,000 future mental anguish, or 3) the amounts awarded as future medical cost.

In fraud actions, the objective is to compensate the defrauded party for injuries, not to provide a profit. *Kneip v. UnitedBank–Victoria,* 774 S.W.2d 757, 759 (Tex. App.—Corpus Christi 1989, no writ) (citing *Morriss–Buick Co. v. Pondrom,* 131 Tex. 98, 113 S.W.2d 889, 890 (1938)). The measure of damages given the complaining party is the actual amount of loss resulting directly and proximately from the fraud practiced upon him. *Id.* Therefore, the recoverable damages in Saenz's fraud action would be those she suffered as a result of Armstrong's misrepresentations made during settlement, which are separate from any damages resulting from her head injury.

Mental anguish consists of the emotional response of the plaintiff caused by the tortfeasor's conduct. *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 368 (Tex.1987). To establish mental anguish, a plaintiff must show more than mere worry, anxiety, vexation, embarrassment, or anger. *Town East Ford Sales, Inc. v. Gray,* 730 S.W.2d 796, 803 (Tex.App.—Dallas 1987, no writ); *Trevino v. Southwestern Bell Tel. Co.,* 582 S.W.2d 582, 584 (Tex.Civ.App.—Corpus Christi 1979, no writ). Mental anguish implies a relatively high degree of mental pain and distress. *Automobile Ins. Co. v. Davila,* 805 S.W.2d 897, 907 (Tex.App.—Corpus Christi 1991, writ denied). It is within the jury's province to judge the credibility of witnesses and the weight to be given their testimony. *Kneip,* 774 S.W.2d at 759. This is especially true regarding claims for mental anguish, which are necessarily speculative claims and, thus, should be left to a jury for determination. *Id.* at 760. Part of the proof in a case includes the witnesses themselves, their demeanor, their voice modulation, and the gut feeling they project to the jurors. *Herbert v. Herbert,* 754 S.W.2d 141, 147 (Tex. 1988) (Mauzy, J., dissenting).

Fidelity contends that the only evidence of mental anguish relating to settlement was Saenz's testimony that she worried who would pay the medical bills and worried that she might lose her home. Fidelity posits that this is not evidence of mental pain or anguish. Saenz contends otherwise. Saenz asserts that, based on the evidence presented to the jury, the jurors could reasonably infer that she suffered a high degree of mental anguish from her separate injury caused by Fidelity's actions during settlement.

In reviewing the evidence, we note that Saenz testified that she was very worried about who would pay the medical bills after the time period set forth in the settlement agreement expired. She stated that she worried a lot about the medical bills. She stated she was afraid that once she was responsible for the medical bills her family might lose their house. She explained that when they purchased their home, her husband was working two jobs and she was working, and that she did not know how they would be able to pay for both the medical bills and the house payment. We conclude that the evidence is sufficient to support the jury's finding of past mental anguish.

Once the existence of mental anguish is established, the incalculable amount cannot logically be refuted or shown to be factually insufficient because there are no objective facts by which to measure the amount. *State Farm Mut. Auto. Ins. Co. v.*

*Zubiate,* 808 S.W.2d 590, 601 (Tex.App.—El Paso 1991, writ denied). Translating mental anguish into dollars is necessarily an arbitrary process for which the jury is given no guidelines. *Id.* Much discretion must be given to the jury in setting the amount. *Id.* We are not free to substitute our judgment for that of a jury. *Larson v. Cactus Util. Co.,* 730 S.W.2d 640, 641 (Tex.1987). We overrule that portion of appellants' sixteenth point of error relating to the award of past mental anguish damages.

Appellants also contend that there is no evidence to support the award to Saenz of $200,000 for future mental anguish damages. Using the standards of review discussed above, we conclude that the evidence shows that the tortious conduct of Armstrong in settling Saenz's workers' compensation claim will cause Saenz future mental anguish. We overrule the portion of appellants' sixteenth point of error relating to the award of future mental anguish damages.

Fidelity also contends that there is no evidence or that the evidence is factually insufficient to support the award to Saenz of $500,000 as future medical damages which the jury found resulted from the acts of Armstrong when negotiating Saenz's claim that were unrelated to her workers' compensation injury. We agree.

In reviewing the evidence, the only testimony relating to any future medical treatment Saenz might require was presented by Dr. Moore. Dr. Moore testified repeatedly that he was only asked to evaluate Saenz's future medical needs for her head injury. He stated several times that he was never asked to determine a need for any other current or future medical costs flowing from any other injury to Saenz. The only future medical expenses he discussed related to the head injury which was the subject of the worker's compensation claim.

Moreover, Texas Revised Civil Statutes, article 8307, section 5, provides, in part:

Notwithstanding any other provision of this law, as amended, no award of the Board, and no judgment of the court, having jurisdiction of a claim against the association for the cost or expense of items of medical aid, hospital services, nursing, chiropractic services, medicines or prosthetic appliances furnished to an employee under circumstances creating a liability therefore on the part of the association under the provisions of this law, shall include in such award or judgment any cost or expense of any such items not actually furnished to and received by the employee prior to the date of said award or judgment.

Tex.Rev.Civ.Stat.Ann. art. 8307, § 5 (Vernon Pamph.1993).[2]

While appellee did not seek recision of the Compromise Settlement Agreement in its prayer before this Court, nor does the trial court judgment grant such relief, appellee's trial pleading requested such relief in the alternative to recovering future medical damages. We sustain that portion of point sixteen relating to recovery of future medical damages and remand the case to the trial court to consider recision of the Compromise Settlement Agreement with regard to future medical expenses.

### Ratification by Fidelity

By point seventeen, Fidelity asserts that there is no evidence or that the evidence is factually insufficient to support the jury's finding that Fidelity ratified Armstrong's acts and representations relating to settlement of Saenz's claim. At trial, to show ratification by Fidelity, Saenz asserted that Stan Lawson was a managerial agent for Fidelity who authorized the doing and manner of Armstrong's misrepresentation.

The basis for assessing punitive damages against a corporation was long ago summarized by our supreme court: "if, in short, the corporation or its officers by whom it is controlled are guilty of some 'fraud, malice, gross negligence, or oppression,'—the settled rules of law will hold it liable to exemplary damages, but, in our opinion not otherwise." *Fort Worth Elevators Co. v. Russell,* 123 Tex. 128, 70 S.W.2d 397, 405 (1934) (quoting *Hays v. Houston G.N.R. Co.,*

2. Tex.Rev.Civ.Stat.Ann. art. 8307, § 5, repealed January 1, 1991, disposed to Tex.Rev.Civ.Stat. Ann. art. 8308-6.61 *et seq.* (Vernon Pamph. 1993).

46 Tex. 272, 284 (1876)). Unlike an award of compensatory damages against an employee committed in the course and scope of his employment, liability for punitive damages does not flow from the employment relationship through the doctrine of respondeat superior. *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 925 (Tex.App.—Corpus Christi 1991, writ dism'd w.o.j.).

Question ten of the court's charge asked the jury, "Did Fidelity ratify the acts and representations of Gisela Armstrong?" The court instructed the jury that in order for Fidelity to ratify the acts and representations of Armstrong they must find:

a. A managerial agent authorized the doing and the manner of the doing of the act; or

b. The agent who performed the act was employed in a managerial capacity and acted in the scope and course of the employment; or

c. The agent who did the acts was unfit and Defendant was reckless in employing the agent.

A "managerial agent" is one who has the authority to hire, fire and direct employees of the corporation, or who has the authority to manage the entire corporation or a department or division of its business.

The jury answered *yes*.

We find no evidence or claim that Armstrong was unfit and Fidelity was reckless in employing her which would support part c of question ten. Additionally, we find no evidence or claim that Armstrong was a managerial agent for Fidelity which would support part b of question ten. Thus, before Fidelity could be liable for exemplary damages, it was incumbent upon Saenz to show that Fidelity, through a managerial agent, ratified the fraudulent act of misrepresentation Armstrong made to Saenz.

The misrepresentation Saenz complains about are Armstrong's statements that the maximum medical care benefits she could recover under workers' compensation was five years.

■ The term "manager," as applied to a representative of a corporation, implies that the management of the affairs of the company has been committed to him with respect to the enterprise under his charge. *Southwestern Bell Tel. Co. v. Wilson*, 768 S.W.2d 755, 764 (Tex.App.—Corpus Christi 1989, writ denied) (citing *Purvis v. Prattco Inc.*, 595 S.W.2d 103, 105 (Tex.1980)); *King v. McGuff*, 149 Tex. 432, 234 S.W.2d 403, 405 (1950). Such an agent is defined as an individual to whom the corporation has confided management of a portion of its business with the authority to employ, direct and discharge servants, and engage in nondelegable duties. *Wilson*, 768 S.W.2d at 764 (citing *Delta Drilling v. Cruz*, 707 S.W.2d 660, 665–66 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.)); *Missouri Pac. R.R. Co. v. Dawson*, 662 S.W.2d 740, 744 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.). Saenz attempts to support the jury's finding on Fidelity's ratification by claiming that Stan Lawson was the "managerial agent" who authorized or ratified the doing and the manner of Armstrong's fraudulent representation.

Once again, in reviewing an attack on the legal sufficiency of the evidence or a "no evidence" point, we consider only the evidence and reasonable inferences that tend to support the jury findings, and disregard all evidence and inferences to the contrary. *Responsive Terminal Sys., Inc.*, 774 S.W.2d at 668. If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Southern States Transp., Inc.*, 774 S.W.2d at 640.

In reviewing an attack upon the factual sufficiency of the evidence, we consider, weigh, and examine all of the evidence which supports and which is contrary to the jury's determination. *Plas-Tex, Inc.*, 772 S.W.2d at 445. Having done so we set aside a jury finding only if the evidence standing alone is too weak to support the finding, or the answer is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Garza*, 395 S.W.2d at 823.

■ Upon review of the entire record, we conclude that Saenz failed to establish that Lawson was a managerial agent. We set out below all testimony at trial that possibly related to Lawson and which might show

that he was a managerial agent for Fidelity with the capacity to bind Fidelity for exemplary damages. At trial, Saenz's attorney questioned Armstrong, and the following exchange occurred:

Q: All right, now, everything you did in this case, Mrs. Armstrong, up to April 8, 1987, was approved by your supervisor, at that time being Mr. Stan Lawson; is that correct?

A: Yes, sir.

Q: What is Mr. Lawson's position, ma'am?

A: He's a supervisor.

Q: In charge of a particular area for the company of this state?

A: At that time he was supervisor for two or three adjusters.

\* \* \* \* \* \*

Later, Fidelity's attorney questioned Armstrong, and the following exchange occurred:

Q: Now, Mr. Stan Lawson was your supervisor; am I correct?

A: Yes, sir.

Q: In this particular claim?

A: Yes, sir.

Q: How experienced is Mr. Stan Lawson?

A: He's been with U.S.F. & G. for 25 years.

Q: And how skilled is he in your particular—

Saenz's attorney: Unless Mr. Lawson— if he is going to come I have no objection. Otherwise we would object based on obvious speculation on her part.

The Court: Is he going to be here or not?

Fidelity's Attorney: I don't know whether he is going to be here or not.

The Court: Does she have that kind of knowledge?

Fidelity's Attorney: She reports to him as her supervisor.

The Court: That does not mean that she can determine about his qualifications. Go ahead.

\* \* \* \* \* \*

Saenz's attorney also questioned Barbara Matthews, who was designated as the corporate representative for Fidelity in the lawsuit. The following exchange took place regarding Lawson:

Q: And when [Armstrong] says her evaluations or her conduct was being reviewed by Mr. Stan Lawson, Mr. Lawson is basically—I guess we call him a managerial agent, is he not?

A: He's a supervisor.

Q: He's a supervisor within the company, and he was—his responsibility was to supervise the contract of Gisela Armstrong?

A: Yes, sir.

Q: And to your knowledge he was aware of what Gisela did in the handling of this claim?

A: Yes, sir.

\* \* \* \* \* \*

After carefully reviewing the record, we find no other testimony presented about Lawson's position, duties, or responsibilities with Fidelity. The issue is whether Lawson was a managerial agent, who, by his decision, could bind Fidelity for exemplary damages. Based upon the jury question and instruction submitted, this issue must be determined before a punitive damage award may be sustained against Fidelity.

We conclude that there is no evidence of probative force establishing Lawson as a managerial agent for Fidelity. Armstrong testified that Lawson was a supervisor for two or three adjusters who were each handling approximately 100 claims per week. Armstrong explained that she prepared an oral evaluation of Saenz's case and presented it to Lawson. Armstrong explained that based on what she told Lawson, he authorized her to settle the case. However, there is no evidence about whether Armstrong told Lawson about the misrepresentation. Even if she did tell Lawson, there is no evidence that he was a managerial agent who could bind Fidelity for exemplary damages. The evidence presented showed only that Lawson reviewed files for two or three telephone adjustors. This testimony does not establish the scope or responsibilities of Lawson's position necessary to find that Lawson was a

managerial agent for Fidelity. The record is void of any testimony about Lawson's position within the company other than that he was a supervisor. While Armstrong testified that Lawson supervised adjustors, this alone does not show that Lawson had the ability to hire, fire, and direct employees of the corporation, or had the authority to manage any part of Fidelity's business in accordance with the jury instruction. *See Wilson*, 768 S.W.2d at 765 (no evidence Bell representatives could employ, direct and discharge servants, engage in performance of nondelegable duties of master, or manage any part of Bell's business). Unlike *Delta Drilling* and *Tucker*, in which the alleged managerial agents testified, Lawson did not testify at trial in this case, and there is nothing in the record detailing his job responsibilities. Also, there is no evidence that Lawson supervised the department or that he was over all of the adjustors, duties which might have suggested that he was a managerial agent. The only evidence connecting Fidelity to Armstrong's representation was Armstrong's testimony that Lawson approved everything she did. This testimony does not suffice as evidence that Lawson was a managerial agent for Fidelity. There is no evidence presented from which the jury could have determined that Lawson was a managerial agent for Fidelity.

 Even if we were to assume that Lawson was a managerial agent for Fidelity, there is still not sufficient evidence to support the jury's answer to question ten. The record is void of any evidence that Lawson, in *any* capacity, told Armstrong to lie about anything. It is difficult to imagine that Armstrong's simple answer, "Yes," to the question did Lawson approve everything you did up to April 8, 1987, can be construed to mean that he approved her misrepresentation to Saenz. There is no evidence or the evidence is factually insufficient to support the jury's finding that anyone from Fidelity authorized Armstrong's misrepresentation. We sustain point seventeen.

Additionally, for the reasons stated, we reverse the award to Saenz of $4 million as punitive damages. We note that jury question fourteen, an exemplary damage question

relating to Fidelity, asked, "[w]hat sum of money, if any, should be assessed against Fidelity as exemplary damages?". This question was conditioned upon the jury answering "Yes" to *both* questions ten, addressing ratification, and thirteen, addressing conscious indifference. Although the jury answered "Yes" to both questions, because we have concluded that the evidence was insufficient to support the affirmative answer to question ten, we reverse the award of $4 million as punitive damages to Saenz. We sustain the portion of appellant's point of error twenty-one relating to punitive damages assessed against Fidelity.

## Statute of Limitations

 By points eight through twelve, Fidelity contends that the statute of limitations prevents Saenz from bringing any of her causes of actions. The statute of limitations for a fraud action is four years from the accrual date of the cause of action. *Williams v. Khalaf*, 802 S.W.2d 651, 658 (Tex.1990). Saenz originally sued Fidelity on June 26, 1989, and later amended her petition alleging fraud. She first sued Armstrong May 30, 1990. At its earliest point, a cause of action for fraud could not have accrued before April 1987, the date of settlement. Therefore, Saenz's fraud actions against Fidelity and Armstrong are not barred by limitations.

We note that Fidelity argues in its brief that the statute of limitations bars Saenz's breach of the duty of good faith claim, insurance code violations, and her DTPA claim. We decline to address these issues because they are not dispositive in light of our conclusion that Saenz's cause of action for fraudulent misrepresentation was proper. We overrule points eight through twelve.

## Conscious Indifference

Fidelity contends by point twenty-two that the jury's answers to questions twelve and thirteen, by which it found Fidelity and Armstrong acted with conscious disregard to the rights of Saenz, are erroneous because they were predicated upon the jury answering questions eight and nine which addressed violations of the insurance code. Fidelity contends that the jury found conscious indif-

ference based *solely* on violations of Texas Insurance Code, Article 21.21. We disagree.

Questions twelve and thirteen were not solely predicated upon the jury answering questions eight and nine. Question twelve was predicated by the statement, "if you have answered Questions Nos. 2, 4, 7, 8, or 9 'yes,' then answer Question No. 12." Question thirteen was predicated by the statement, "if you have answered Questions Nos. 2, 4, 7, 8, or 9 & 10 'yes,' then answer Question No. 13." We note that questions two and four addressed Armstrong's fraudulent acts, and therefore, the jury did not find that Armstrong acted with conscious indifference *solely* based upon violations of the Texas Insurance Code. We overrule point twenty-two.

By point eighteen, Fidelity contends that its actions and/or Armstrong's actions did not rise to the level of conscious indifference. Because we have already determined that Fidelity did not ratify the fraudulent misrepresentation made by Armstrong, we will only address whether Armstrong acted with an entire want of care and with conscious indifference to the rights of Saenz.

The jury found and the court awarded Saenz $250,000 as exemplary damages against Armstrong. In order to be entitled to exemplary damages, the injured party must show such an entire want of care which would raise the belief that the act or omission complained of was the result of conscious indifference to the rights or welfare of the person affected by it. *Davila*, 805 S.W.2d at 908–09; *Trenholm*, 646 S.W.2d at 933. The purpose or intent of the defendant is determinative of his liability for exemplary damages. *Davila*, 805 S.W.2d at 909. The fact that an act is intentional or legally wrongful will not support an award of punitive damages; the act must be intentionally wrongful, or must be motivated by ill will and a desire to injure the other party. *Id.*

The jury, based upon its answer to question two, determined that Armstrong intended for Saenz to rely upon the representation that five years of medical benefits were all that she could receive under the law. This misrepresentation directly affected Saenz's right to seek lifetime medical benefits and adversely affected her welfare.

The letters from Fidelity's attorneys to Armstrong indicate that they strongly suggested Armstrong get Saenz to settle so that Fidelity could avoid potentially paying medical benefits over an extended period of time and possibly for the rest of Saenz's life. To induce Saenz to settle, Armstrong falsely represented to Saenz that all that workers' compensation would pay was five years of future medical costs. The specific consequence desired was that Saenz would settle and not continue wanting Fidelity to pay medical benefits.

We conclude from this evidence that the jury could determine that Armstrong acted with conscious indifference. We overrule point eighteen.

### Amount of Punitive Damages

By point twenty-one, Fidelity contends that the four million dollar punitive damages assessed against it and the $250,000 punitive damages assessed against Armstrong are excessive under the Texas Constitution article I, sections 13 and 19 and the United States Constitution's fourteenth amendment. They contend that the clear and convincing evidence fails to show these damages as a remotely reasonable punishment. Under this point of error, our discussion relates to the amount of punitive damages assessed against Armstrong because above we reversed the award of punitive damages against Fidelity.

There is no set rule or ratio between the amount of actual and exemplary damages which will be considered reasonable, and the amount must depend upon the facts in the particular case. *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981). When we review an amount of punitive damages, we consider the nature of the wrong, the character of the defendant's conduct, degree of culpability, situation and sensibility of the parties, and the extent to which the acts offend a public sense of justice. *Id.* Based upon this review, we find the amount of punitive damages assessed was not excessive.

Additionally, regarding Fidelity's and Armstrong's constitutional complaints, they fail to explain how the award of punitive damages violated their constitutional rights, thus, they did not properly present this argument for appellate review. We overrule point twenty-one.

### Answers to Charge Questions 8 & 9

By points thirteen, fourteen, and fifteen, Fidelity contends that the trial court abused its discretion in submitting questions eight and nine because they asked the jury about violations of insurance commission regulations. Fidelity contends that they were not subject to these regulations. Also, Fidelity contends that there is no evidence or that the evidence is factually insufficient to support the following jury findings: 1) Armstrong failed to fairly and equitably settle Saenz's claim once liability became clear, 2) Armstrong refused any part of Saenz's claim without conducting a reasonable investigation, or 3) that such acts were a producing cause of damages to Saenz. Additionally, Fidelity asserts that the trial court abused its discretion in submitting questions eight and nine because the questions did not require the jury to find that the acts were a general business practice. Saenz responds that these points at best raise issues that result in harmless error.

The improper submission of issues constitutes reversible error when harm is suffered by the complaining party. *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 749–50 (Tex.1980). Assuming without deciding that Fidelity is correct, when determining whether harm is suffered by the erroneous submission of questions, we consider the charge as a whole. *Id.* Generally, error in the submission of an issue is harmless when the findings of the jury in answering other issues are sufficient to support the judgment. *Id.* The exception to this general rule is when an erroneously submitted issue confuses or misleads the jury and then reversible error may exist. *Id.*

Fidelity has failed to demonstrate and the record fails to disclose how the submission of these questions would have misled or confused the jury and how these questions probably resulted in an improper verdict. In this case, the jury found that Fidelity committed fraud which was a producing and proximate cause of damages to Saenz. Thus, other jury findings, supported by the evidence, exist and are sufficient to support the judgment. We overrule points thirteen, fourteen, and fifteen.

Having addressed all of appellant's dispositive points of error, we reverse the portion of the trial court's judgment awarding Saenz $4 million for exemplary damages against Fidelity, and we reverse the portion of the trial court's judgment awarding Saenz $500,000 for future medical care required after April 8, 1992, and remand the case to the trial court to consider recision of the Compromise Settlement Agreement with regard to future medical expenses. We affirm the remainder of the trial court's judgment.

GILBERTO HINOJOSA, J., dissenting, joined by FEDERICO G. HINOJOSA, Jr., J.

GILBERTO HINOJOSA, Justice, dissenting.

I respectfully dissent. I would affirm the jury's award of $4 million in punitive damages and $500,000 in future medical costs to Corina Saenz.

### I. Facts

Saenz suffered a severe head injury when she fell over backwards in a chair at work. She was diagnosed with "post-concussion syndrome," and her physician, Dr. Humberto Tijerina, concluded that Saenz' condition would require medical attention "indefinitely." Saenz sought to recover workers' compensation benefits from Fidelity & Guaranty Underwriters Insurance Company, her employer's workers' compensation carrier.

Gisela Armstrong was the adjuster for Saenz' workers' compensation claim and handled all day-to-day contacts with her. Armstrong testified that everything she did on the Saenz file was approved by her supervisor, Stan Lawson. Lawson had been with Fidelity for twenty-five years, and also supervised one or two other adjusters. Fidelity's corporate representative, Barbara Mat-

thews, testified that in Lawson's capacity as Armstrong's supervisor, it was his responsibility to supervise the Saenz claim. She stated that to her knowledge Lawson was aware of what Armstrong did in the handling of the Saenz claim. Lawson did not testify at trial.

In February, 1987, Fidelity requested a prehearing conference with the Industrial Accident Board (IAB). A letter to Armstrong from Trey Gillespie, an attorney for Fidelity, states: "Obviously this is a potentially dangerous case in the valley ... it appears that the claimant's complaints with regards [sic] to seizures and headaches are legitimate." Gillespie also stated that Saenz' employer had indicated that it would not permit Saenz to return to work. Gillespie expressed his desire to reach a reasonable settlement in the prehearing conference, "without scaring the claimant off to an attorney." He then stated, "If the claimant has some motivational problems, it would probably be to your benefit to try to work out a settlement within the next couple of months."

Armstrong called Saenz before the prehearing conference. She offered Saenz $65,-000 cash and an additional five years of open medical, but Saenz declined because she was concerned about future medical costs. Saenz testified that she specifically inquired into the possibility of obtaining lifetime medical, and that Armstrong replied that the maximum workers' compensation benefit she could receive was five years of medical care. Saenz understood that this offer was the most that Fidelity would pay. Saenz testified that Armstrong told her that she would not need an attorney at the prehearing conference, because the settlement amount would be the same, except that she would have to pay a lawyer 25% out of the settlement amount.

At the prehearing conference on April 8, 1987, Saenz accepted Fidelity's settlement offer of $65,000 cash and five years open medical care. Fidelity was represented by an attorney, Jimmie Ross Weaver. Saenz was not represented by an attorney. After the settlement agreement was reached, Weaver sent a post-hearing report to Armstrong in which he noted that the Saenz file was "obviously a very dangerous case and one that we might well end up having to pay out weekly for the full period of total disability." He observed that, "by settling the case at this time, [Fidelity] avoided the possibility that this lady's condition could deteriorate and eventually result in a condition of imbecility which would cause [Fidelity] to pay statutory lifetime compensation benefits in addition to lifetime medical benefits."

Saenz sued Fidelity on the theories of fraud and breach of the duty of good faith and fair dealing in the settlement of her workers' compensation claim. The jury found that Armstrong maliciously, fraudulently and knowingly misrepresented the benefits provided under the workers' compensation insurance policy carried by Saenz' employer, and that such misrepresentation was a proximate and producing cause of Saenz' damages. The jury also found that Fidelity breached its duty of good faith and fair dealing in handling Saenz' claim and that the breach was a proximate cause of Saenz' damages. Furthermore, the jury found that Fidelity ratified the acts and representations made by Armstrong. The actual damages award was comprised of $50,000 for past mental anguish, $200,000 for future mental anguish, and $500,000 for reasonably necessary medical care after the expiration of the five years of open medical benefits. Upon a finding that both Armstrong and Fidelity acted with conscious indifference, the jury awarded $250,000 in punitive damages against Armstrong and $4 million in punitive damages against Fidelity.

I would affirm each and every one of the jury's findings, including the finding that Fidelity breached its duty of good faith and fair dealing in settling Saenz' workers' compensation claim. However, because the damages awards were not assigned to a particular ground of recovery, the majority's upholding of the jury's finding that Fidelity defrauded Saenz is dispositive of the case. Accordingly, although the particularly egregious facts of this case support the jury's finding that Fidelity breached its duty of good faith and fair dealing, I will not address the issue.

## II. Future Medical Costs

I would affirm the jury's award of $500,000 in future medical costs to Saenz. The majority holds that no evidence supports the $500,000 future medical costs awarded to Saenz because the only evidence supporting the figure was Dr. Richard Moore's testimony that Saenz would require $1.6 million in lifetime medical expenses as a result of her work-related head injury. They conclude that article 8307 of the Texas Workers' Compensation Act precludes consideration of these future medical expenses. Thus, the issue to be decided is whether the medical expenses presented at trial, which were originally necessitated by Saenz' work-related head injury, can be considered in the calculation of damages flowing from Fidelity's fraudulent misrepresentations. I would hold that they can.

The $500,000 in future medical costs were awarded to Saenz to compensate her for Fidelity's fraudulent misrepresentations. This is not a cause of action by Saenz to recover for injuries she received in the work place. Saenz is not suing her employer for negligently allowing her head injury to occur; nor is Saenz suing the workers' compensation carrier to increase her benefits. The majority acknowledges the distinction between a cause of action based upon Fidelity's fraudulent misrepresentations and a cause of action based upon a work-related injury when it holds that Saenz was not required to bring suit to rescind the CSA to recover damages. The majority states:

> We agree that this is not an action for additional workers' compensation benefits. Rather, it is a suit filed asking for recovery of damages completely unrelated to the workers' compensation injury. The actionable injury complained about here results from Fidelity's alleged misrepresentation of recoverable medical benefits. We conclude that the court was not required to submit issues to the jury about rescission of the IAB-approved CSA.

That the fraud in this case is a tort which exists separate and apart from the workers' compensation system is consistent with current case law. In *Aranda v. Insurance Co. of N.A.*, 748 S.W.2d 210, 212–13 (Tex.1988), the Supreme Court of Texas recognized that an insurance company's breach of the duty of good faith and fair dealing was a tort which existed separate and apart from a claim under the workers' compensation system, even though the bad faith claim would not exist if the underlying work-related injury had not occurred. Accordingly, I believe that, if Saenz elects to pursue a fraud cause of action, she should be entitled to recover whatever damages flow from the fraud.

The policy underlying the tort compensation system is to compensate an injured party for the damage he or she has suffered. Prosser, LAW OF TORTS, 7 (4th edition 1971). The goal is to restore the injured party to the place he or she would have been "but for" the tortfeasor's harmful conduct. Thus, the measure of damages in a fraud action is the actual amount of loss resulting directly and proximately from the fraud practiced upon the claimant. *Kneip v. UnitedBank–Victoria*, 774 S.W.2d 757, 759 (Tex. App.—Corpus Christi 1989, no writ).

The amount recoverable in Saenz' fraud action is the amount of medical benefits she would have received "but for" Armstrong's fraudulent misrepresentations. This amount is represented by the difference between the fraudulently induced settlement amount, which was five-years of open medical benefits, and the medical benefits which Saenz will require for the rest of her life as a result of her head injury. Dr. Moore's testimony was relevant to establish the latter figure. His $1.6 million "life care plan" was the amount of medical expenses to which Saenz was initially entitled.

The majority adopts Saenz' argument that her cause of action for fraud is not a *Brannon*-type rescission claim, in which a party is seeking to increase compensation for a work-related injury. *See Brannon v. Pacific Employers Ins. Co.*, 148 Tex. 289, 224 S.W.2d 466, 469 (1949). If Saenz' cause of action were one in which she sought to increase the compensation she was awarded under the Workers' Compensation Act, then I would agree with the majority's conclusion that Dr. Moore's testimony regarding the necessity of a $1.6 million "life care plan" is precluded by article 8307 of the Workers' Compensation

Act. However, as the majority acknowledges, Saenz' fraud cause of action is separate and apart from any work-related injury. Thus, I do not believe that Dr. Moore's $1.6 million "life care plan" is precluded by article 8307. Dr. Moore's testimony simply establishes the amount of medical benefits Saenz would have received "but for" Fidelity's fraudulent misrepresentations. In other words, Dr. Moore's testimony establishes that Saenz' injury required life-time medical benefits rather than the five year cap that was misrepresented to her by Armstrong. Those were her damages for the fraud and that is what she is entitled to recover under the well-settled law pertaining to the measure of damages for fraud. *See Kneip*, 774 S.W.2d at 759.

The majority's reliance on the Workers' Compensation Act to deny Saenz' recovery for future medical expenses is misplaced. The Act does not cover intentional torts such as fraud. *Porter v. Downing*, 578 S.W.2d 460, 461 (Tex.Civ.App.—Texarkana 1979, writ ref'd n.r.e.); *Aetna Ins. Co. v. Hart*, 315 S.W.2d 169, 172 (Tex.Civ.App.—Houston 1958, writ ref'd n.r.e.). Moreover, the Act applies to "damage or harm to the physical structure of the body," TEX.REV.CIV.STAT. ANN. Art. 8306, sec. 20 (Vernon 1967), and not to injuries which are pecuniary in nature, such as those flowing from fraudulent misrepresentations.

If the majority is correct then the only actual damages recoverable in a case of this nature would be nonpecuniary damages such as mental anguish. An insurance company, such as the one here, could therefore defraud claimants with impunity with the knowledge that, if caught, and a fraud or duty of good faith and fair dealing action is brought, it could keep the benefits of its fraudulent conduct,[1] and may be required to pay only nonpecuniary damages such as mental anguish.[2] That this is true is evidenced by the fact that the majority's holding reduces Saenz' recovery of actual damages from $750,000 to $250,000, even though it acknowledges that Saenz was defrauded when she only received five years of medical benefits for her work-related injury and there was evidence that she was entitled to lifetime benefits. I hardly see the justice in such a holding. Moreover, it would be inconsistent with the supreme court's holding in *Aranda* which permits the recovery of pecuniary damages for breach of the duty of good faith and fair dealing, even though the cause of action tangentially depends, as it does here, on a work-related injury.

### III. Punitive Damages

In addition to future medical costs, I would affirm the jury's award of $4 million in punitive damages against Fidelity. The majority concludes that no evidence supports the jury's finding that Stan Lawson was a managerial agent, as that term was defined in the charge. They also conclude that, even if Lawson were a managerial agent, no evi-

---

1. Although rescission remains as a remedy, I do not believe that it is a viable one. First, one of the policies underlying the workers' compensation system is to provide prompt relief to an injured worker. A defrauded claimant electing to pursue rescission of a settlement agreement will have to wait years before full benefits are received. After a work-related injury and settlement before the Industrial Accident Board (IAB), she would have to bring suit for rescission in a district court. If successful, the judgment may be appealed, and, if successful, the defrauded claimant would have to go back to the IAB and renegotiate a settlement or receive an IAB award, which can again be appealed to the district court and possibly courts of appeals. This whole process could take years to complete and leave an injured worker without the means to support herself or her family, and possibly without badly needed medical care. That Saenz' settlement agreement granting five years of medical benefits has already expired is evidence that

any benefits a claimant receives from a fraudulently induced settlement agreement would probably not support the claimant while the judicial process runs its course.

I would also note that a remedy of rescission in cases such as this is judicially inefficient. We should not burden our judicial system by forcing a claimant back to the IAB, and perhaps to district court, to get the benefits to which he or she was originally entitled, since the same benefits should be bestowed as money damages in the same suit.

2. Although punitive damages are available for fraud, they are difficult to recover against a corporation because, unlike actual damages, a plaintiff must prove ratification of such agent's acts by the corporation which, as the majority opinion bears out, is almost impossible to achieve in this type of a case.

dence supports the jury's finding that Lawson authorized Armstrong's misrepresentations. I disagree.

The majority has already enumerated the standard of review on a factual sufficiency challenge. However, the majority does not acknowledge the limitation underlying an appellate court's review of the record, which is that an appellate court is not a fact finder, and cannot substitute its judgment for that of the jury, even if a different answer could be reached on the evidence. *Houston Lighting and Power Co. v. Sue*, 644 S.W.2d 835, 843 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). When conflicting testimony is given, it is the exclusive province of the jury to judge the credibility of witnesses and to determine the weight to be given their testimony. *Fruehauf Corp. v. Ortega*, 687 S.W.2d 777, 782 (Tex.App.—Corpus Christi 1985, no writ). Upon weighing the evidence before them, jurors have a right to use their common knowledge and life experience. *Maryland Casualty Co. v. Hearks*, 144 Tex. 317, 190 S.W.2d 62, 64 (1945).

Circumstantial evidence is every bit as probative as direct evidence in a sufficiency of the evidence challenge. An ultimate fact may be conclusively shown by wholly circumstantial evidence. *Walter Baxter Seed Co. v. Rivera*, 677 S.W.2d 241, 244 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved in the case. *Id.* Circumstantial evidence is sufficient to establish the authorization of, participation in, or ratification of the acts of an agent that make a principal liable for exemplary damages growing out of the agent's acts. *Connell v. Rosales*, 419 S.W.2d 673, 677 (Tex.Civ.App.—Texarkana 1967, no writ). Moreover, a presumption of ratification will arise from only slight evidence when the act done by an agent is plainly for the benefit of a principal. *National Resort Communities, Inc. v. Cain*, 512 S.W.2d 367, 372 (Tex.Civ.App.—Austin 1974), *rev'd on other grounds*, 526 S.W.2d 510 (Tex.1975).

The two issues to decide are whether sufficient evidence exists to affirm the jury's findings that Lawson was 1) a managerial agent

for Fidelity, 2) who authorized the doing and the manner of Armstrong's fraudulent acts. Armstrong testified that everything she did on the Saenz file was approved by Lawson, who was the supervisor for two or three adjustors that each handled approximately 100 claims per week. She also stated that Lawson had been with Fidelity for twenty-five years. Matthews, Fidelity's corporate representative, testified that, to her knowledge, Lawson was aware of what Armstrong did in the handling of Saenz' claim.

With respect to managerial agent, the majority states that Lawson only "reviewed files for two or three telephone adjustors," and that this testimony does not describe a managerial agent as defined in the charge. The majority also states that the record does not reveal Lawson's formal title, or position, with Fidelity, other than that he was a supervisor.

However, titles are not conclusive. To prove that Lawson was a "managerial agent," Saenz needed only to satisfy the definition of managerial agent provided in the charge, i.e., that Lawson had the "authority to hire, fire and direct employees of the corporation, or ... the authority to manage the entire corporation or a department or division of its business." The jury found that Lawson was a managerial agent, and I believe that sufficient circumstantial evidence exists to support the jury's finding.

That many supervisors, particularly ones who have been with a company for twenty-five years, have the power to direct, hire and fire employees is within the common knowledge and experience of persons who serve on a jury. Both Armstrong and Matthews testified that Lawson either approved, or was aware of, everything Armstrong did on the Saenz file. I believe that it would be reasonable to infer that Lawson had the power to direct, hire and fire the three adjustors that he supervised. Few other reasons exist to justify Lawson's approval of the adjustors' files. That this is proved circumstantially does not negate its probative value. To hold otherwise, just because direct evidence was unavailable, encroaches upon the jury's province as trier of fact. The jury was at trial, and we were not, to observe Armstrong's and

Matthews' demeanor and assign the weight to be given their testimony.

With respect to authorization, the majority states that the only evidence connecting Fidelity to Armstrong's misrepresentation was Armstrong's testimony that Lawson approved everything she did, and that there is no evidence that Armstrong told Lawson about the misrepresentation. However, it is doubtful that there would ever be direct evidence of the ratification of fraudulent acts. Moreover, circumstantial evidence is sufficient to establish the authorization of an agent's acts. *Connell,* 419 S.W.2d at 677. One can only expect to see a smoking gun, and leave the jury to infer the rest.

I believe that the jury could have reasonably inferred that Lawson knew of and approved Armstrong's fraudulent misrepresentations. The jury found, and the majority affirmed, that Armstrong made certain fraudulent misrepresentations to Saenz. It is reasonable to assume that the letters from Weaver and Gillespie that instructed Armstrong to settle the case without "scaring" Saenz off to an attorney were kept in the Saenz file and were, therefore, reviewed by Lawson. Because Lawson read the letters, and observed that the object of the letters was obtained—Saenz attended the conference without an attorney and settled her case—it would be reasonable for the jury to infer that Lawson knew of and approved Armstrong's fraudulent misrepresentations.

If this circumstantial evidence supporting Lawson's authorization of Armstrong's fraudulent misrepresentations is not sufficient to affirm the jury's finding, then this Court is opening wide a window of unaccountability through which even maliciously fraudulent insurance companies would always escape from liability. Ratification is very difficult to prove. That is why a presumption of ratification arises from only slight evidence that the act done by an agent is plainly for the benefit of a principal. *Cain,* 512 S.W.2d at 372. Weaver's post-hearing letter is strong evidence that Fidelity greatly benefitted from the fraudulently procured settlement agreement.

Once again, to hold that Lawson did not authorize, approve, or ratify Armstrong's fraudulent misrepresentations would encroach upon the jury's province as trier of fact. It was the jury, and not this panel of judges, who was there to observe Armstrong's demeanor and determine the weight to be given her testimony.

Because I believe that there is sufficient evidence that Lawson was a managerial agent who authorized the doing and the manner of Armstrong's fraudulent misrepresentations, I would affirm the jury's award of $4 million in punitive damages against Fidelity.