# Supreme Court of Texas

No. 21-0017

Sarah Gregory and New Prime, Inc.,

*Petitioners,*

v.

Jaswinder Chohan, et al.

*Respondents*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued January 31, 2023**

JUSTICE BLACKLOCK announced the Court's judgment and delivered an opinion, in which Chief Justice Hecht and Justice Busby joined in full, and in which Justice Bland joined except as to Parts II.C.2 and II.D.

JUSTICE DEVINE filed an opinion concurring in the judgment, in which Justice Boyd joined.

JUSTICE BLAND filed an opinion concurring in part and concurring in the judgment.

Justice Lehrmann, Justice Huddle, and Justice Young did not participate in the decision.

This case arises from a fatal accident on an icy, unlit stretch of highway near Amarillo. An eighteen-wheeler driven by Sarah Gregory jackknifed across lanes of traffic, and the resulting pileup caused four deaths. Among those killed was Bhupinder Deol, a truck driver, but more importantly a husband, son, and father of three.

Deol's wife and family brought a wrongful death action against Gregory and her employer, New Prime, Inc. The jury awarded approximately $16.8 million to Deol's family. Noneconomic damages—awarded to six family members for past and future mental anguish and loss of companionship—accounted for just over $15 million of the total. On appeal, the defendants challenged the size of the noneconomic damages award. The en banc court of appeals affirmed, concluding that the award was not "flagrantly outrageous, extravagant, and so excessive that it shocks the judicial conscience." 615 S.W.3d 277, 314 (Tex. App.—Dallas 2020). The chief issue before this Court is the size of the noneconomic damages award.

Assigning a dollar value to non-financial, emotional injuries such as mental anguish or loss of companionship will never be a matter of mathematical precision. But when properly called upon, appellate courts have a duty to ensure that the damages awarded for a noneconomic injury are the result of a rational effort, grounded in the evidence, to *compensate* the plaintiff for the injury. As we held over twenty years ago in *Bentley v. Bunton*, courts do not fully discharge that duty merely by concluding that a verdict is not so "excessive or unreasonable" as to shock the judicial conscience. 94 S.W.3d 561, 606 (Tex. 2002). We said almost 140 years ago that "[w]hat shocks the

2

conscience or manifests passion or prejudice in the jury are tests too elastic for practical use in the great majority of cases." *Gulf, C. & S. F. Ry. Co. v. Dorsey*, 18 S.W. 444, 445 (Tex. 1886). Our precedent requires courts reviewing the size of noneconomic damages awards to do more than consult their consciences.

As we have said before when reviewing mental anguish damages, "[t]here must be evidence that the *amount* found is fair and reasonable *compensation*, just as there must be evidence to support any other jury finding." *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) (emphasis added). Rather than limit review of noneconomic damages to elastic, impractical standards like the "shocks the conscience" test, our precedent instead requires evidence of both the "existence of compensable mental anguish" and "evidence to justify the amount awarded." *Id.*

Today's case requires us to apply these principles from our prior holdings regarding mental anguish damages for the first time to a wrongful death claim. "While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited." *Bentley*, 94 S.W.3d at 606 (quoting *Saenz*, 925 S.W.2d at 614). No matter the cause of action, the results of litigation should always be justifiable based on evidence and reason. "Juries cannot simply pick a number and put it in the blank." *Id.* To guard against arbitrary outcomes and to ensure that damages awards are genuinely compensatory, the plaintiff in a wrongful death case should be required to demonstrate a rational connection,

3

grounded in the evidence, between the injuries suffered and the dollar amount awarded.

Mental anguish and loss of companionship damages are neither punitive nor exemplary. They are compensatory. That label is illusory if courts do not require a rational connection between the amount awarded and the evidence of injury. While precision is not required—and surely cannot be achieved when placing a dollar value on the emotional toll of losing a loved one—some rational basis for the size of the judgment is a minimal requirement on which the law must insist.

Here, the plaintiffs produced—and the court of appeals recounted—sufficient, even ample, evidence demonstrating the *existence* of compensable mental anguish and loss of companionship suffered by Deol's family. But nothing in the record or in the plaintiffs' arguments demonstrates a rational connection between the injuries suffered and the *amount* awarded. The arguments made to the jury regarding the proper amount included references to the price of fighter jets, the value of artwork, and the number of miles driven by New Prime's trucks. Rather than rationally connect the evidence to an amount of damages, these arguments did just the opposite by encouraging the jury to base an ostensibly compensatory award on improper considerations that have no connection to the rational compensation of Deol's family.

We also agree with Gregory and New Prime that the trial court incorrectly excluded a responsible third party from the jury charge. Because a reasonable jury could have determined that another company's truck was at least partly responsible for Deol's death, the

4

trial court should not have denied the defendants' request to designate that company as a responsible third party.

The judgment of the court of appeals is reversed, and the case is remanded for a new trial.

## I.

Around midnight on November 23, 2013, Sarah Gregory was driving a New Prime eighteen-wheeler eastbound on Interstate 40 toward Amarillo. The road was icy, traffic was light, and Gregory was traveling at 58 miles per hour. The highway had two lanes in each direction, divided by a median. In response to brake lights indicating a traffic jam a half a mile or so ahead, Gregory applied the brakes. The truck began to slide on the ice, and she lost control of it. The truck "jackknifed," which means that its trailer began to skid, pushed the cab out of alignment with the trailer, and eventually folded the cab back toward the trailer, rendering the truck immovable. When the truck came to rest, it was blocking the entire left lane and some of the right lane. Gregory did nothing to warn the drivers behind her of the obstruction. The highway was unlit, so approaching drivers had little notice of the hazard shrouded in the darkness ahead.

A tragic multi-vehicle pileup ensued. In addition to the New Prime truck, the accident involved two passenger vehicles and six other eighteen-wheelers. The first two vehicles to arrive on the scene were both trucks—a Maryland Trucking Company truck driven by Bhupinder Deol and a Danfreight Systems truck. Deol came first. Both trucks managed to steer around the New Prime truck on the right, but the Danfreight truck clipped Deol's truck after both had passed by. Deol's

5

truck eventually stopped on the right shoulder of the road not too far past the disabled New Prime truck, and the Danfreight truck stopped on the grass between the highway and the feeder road.

Next came a truck owned by ATG Transportation. Unlike the two trucks before it, the ATG truck did not make it around the New Prime truck. Instead, its driver veered right and lost control. The ATG truck turned onto its side on the right shoulder, blocking most of the remaining space between the New Prime truck and the right edge of the highway. Only a few feet of space separated Gregory's truck, jackknifed on the left, from the ATG truck, overturned on the right.

Following behind the ATG truck was a van driven by Guillermo Vasquez.[1] Vasquez saw the ATG truck fall over on the right side of the road and steered left in response, but he could not avoid the wall of trucks almost entirely blocking the road. The Vasquez van hit the New Prime truck at less than ten miles per hour. A Prius followed the Vasquez van, crashing at high speed into the ATG truck on the right.[2] At this point, neither Deol nor the Vasquez van's passengers had been seriously injured. The next truck, however, struck the back of the Vasquez van at 56 miles per hour. This truck belonged to P&O Transport. After that collision, the final two trucks—belonging to DOD Reynolds and CDO Express Diversified—collided with the P&O truck.

Some time before the P&O truck arrived, Deol left his truck to assist victims of the accident. Adam Moseley, a DPS officer who

---

[1] Five of Vasquez's family members were riding in the van with him. His wife Alma and his son-in-law Hector Perales were among the deceased.

[2] Another decedent was Tracy Jones, a passenger in the Prius.

responded to the scene, testified that Deol's injuries suggested he had been killed when the Vasquez van—pushed forward by the force of the successive collisions with the P&O, DOD, and CDO trucks—rolled over and crushed him.

Deol's estate and family sued Gregory and New Prime, among others, seeking compensatory damages for (1) economic losses caused by Deol's death, (2) Deol's conscious pain and suffering, and (3) the mental anguish and loss of companionship suffered by his wife, three children, and parents. The estates and families of the other decedents intervened in the litigation, but the Jones parties later settled, leaving the families of Deol, Vasquez, and Perales to go to trial. The jury's verdict awarded almost $39 million to the plaintiffs, and Deol's family's share of the final judgment was $16,447,272.31. Deol's family's noneconomic damages accounted for $15,065,000 of the verdict.[3]

After the verdict, Gregory and New Prime settled with the Vasquez and Perales parties. Gregory and New Prime appealed, raising a host of issues. On appeal, the Deol parties were the only remaining

---

[3] The jury verdict awarded Deol's wife Jaswinder Chohan $7,437,500, including (1) $350,000 for loss of past companionship, (2) $2,625,000 for loss of future companionship, (3) $525,000 for past mental anguish, and (4) $3,937,500 for future mental anguish. It awarded each of his two sons $2,445,000, including (1) $160,000 for loss of past companionship, (2) $1,200,000 for loss of future companionship, (3) $160,000 for past mental anguish, and (4) $925,000 for future mental anguish. His daughter was awarded $1,457,500, including (1) $160,000 for loss of past companionship, (2) $1,200,000 for loss of future companionship, (3) $5,000 for past mental anguish, and (4) $92,500 for future mental anguish. Finally, each of Deol's parents were awarded $640,000. Both received $160,000 for each category of damages. Economic losses and Deol's conscious pain and suffering accounted for the rest of the verdict.

7

plaintiffs. On its own motion, the court of appeals took the case en banc before a panel opinion was issued. A 10–4 majority affirmed the judgment on all issues. The defendants now raise three issues in this Court. They contend that (1) the court of appeals reviewed the amount of the noneconomic damages award under an overly deferential standard of review, (2) the amount of the award finds no support in the evidence, and (3) ATG should have been designated as a responsible third party. As explained below, we largely agree with Gregory and New Prime.

## II.

## A.

Noneconomic damages are the exception, not the norm, in tort law. The common law has long hesitated to recognize mental or emotional injuries absent an accompanying physical injury. *E.g.*, *Lynch v. Knight* (1861) 11 Eng. Rep. 854, 863 ("Mental pain or anxiety the law cannot value, and does not pretend to redress, when the unlawful act complained of causes that alone.").[4] Consistent with the common law tradition, this Court first allowed recovery of mental anguish damages in personal injury cases only when there was an accompanying physical injury to the plaintiff. *Hill v. Kimball*, 13 S.W. 59, 59 (Tex. 1890). We

---

[4] *See also Blake v. Midland Ry. Co.* (1852) 118 Eng. Rep. 35, 42 ("[W]e are of opinion that the learned Judge at the trial ought more explicitly to have told the jury that, in assessing the damages, they could not take into their consideration the mental sufferings of the plaintiff for the loss of her husband . . . ."); *Baker v. Bolton* (1808) 170 Eng. Rep. 1033, 1033 ("In a civil Court, the death of a human being could not be complained of as an injury; and in this case the damages, as to the plaintiff's wife, must stop with the period of her existence.").

8

later expanded that rule to allow recovery when the mental anguish produces some physical manifestation. *Gulf, C. & S. F. Ry. Co. v. Hayter*, 54 S.W. 944, 945 (Tex. 1900). The chief justifications for the common law's skepticism of mental anguish damages were "[t]he inherently subjective nature of mental anguish," "the concomitant potential for false claims," and the resistance of non-pecuniary, emotional injuries to rational monetization. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 442 (Tex. 1995).

In keeping with the common law, this Court in wrongful death cases long adhered to the pecuniary loss rule, a "well settled" principle that damages for wrongful death "are measured by the pecuniary injury to the respective parties entitled," and not by reference to a surviving party's pain or mental anguish. *March v. Walker*, 48 Tex. 372, 375 (1877). Not until comparatively recently did our precedent depart from this rule. In 1983, our decision in *Sanchez v. Schindler* departed from the common law's traditional teaching about the difficulty of assigning a dollar value to non-physical injuries and charted a new course for wrongful death cases, reasoning that "present social realities" demanded that "the antiquated and inequitable pecuniary loss rule" be abandoned. 651 S.W.2d 249, 251 (Tex. 1983). We expressed optimism that injuries such as these "are not too speculative to be given a monetary value," although we offered little advice on how that might be done. *Id.* at 253.

Three years after opening the door to mental anguish damages in wrongful death cases in *Sanchez*, we also abandoned—as to wrongful death cases at least—the venerable prohibition on recovery of mental

9

anguish damages without a physical manifestation. *Moore v. Lillebo*, 722 S.W.2d 683, 685–86 (Tex. 1986). *Moore* held for the first time that family members could recover for both mental anguish and loss of companionship without a showing of physical manifestation. *Id.* Since *Sanchez* and *Moore*, this Court has not had occasion to elaborate on how the wrongful death damages authorized by these decisions should be reviewed on appeal.

We have, however, decided other cases involving mental anguish damages that shed light on the inquiry. For personal injury cases in general, we have in the years since *Sanchez* and *Moore* held that "evidence of the nature, duration, and severity of [] mental anguish" is required to establish the existence of mental anguish damages. *Parkway*, 901 S.W.2d at 444; *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011) ("Even when an occurrence is of the type for which mental anguish damages are recoverable, evidence of the nature, duration, and severity of the mental anguish is required.").

A year later, building on *Parkway*, we concluded in a personal injury case that "[n]ot only must there be evidence of the *existence* of compensable mental anguish, there must also be some evidence to justify the *amount* awarded." *Saenz*, 925 S.W.2d at 614 (emphasis added); *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013) ("There must be both evidence of the existence of compensable mental anguish and evidence to justify the amount awarded."). Rejecting the notion that "[t]ranslating mental anguish into dollars is necessarily an arbitrary process," we held that a jury's discretion in crafting these verdicts is not

10

unlimited. *Saenz*, 925 S.W.2d at 614. In short, "[j]uries cannot simply pick a number and put it in the blank." *Id.*

In the years since *Parkway* and *Saenz*, we have applied these limitations on recovery in a line of defamation cases involving mental anguish damages. *Bentley*, 94 S.W.3d at 606; *Hancock*, 400 S.W.3d at 68; *Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017); *Anderson v. Durant*, 550 S.W.3d 605, 618–20 (Tex. 2018). In *Bentley*, we applied the requirement announced in *Saenz* for the first time, overturning a $7 million mental anguish verdict in favor of Bentley even though "[t]he record le[ft] no doubt that Bentley suffered mental anguish." 94 S.W.3d at 606. That record indicated that (1) Bentley could not sleep, (2) he experienced embarrassment in public life, (3) his family life was disrupted, (4) his children were distressed at school, (5) he felt depressed, and (6) he felt that his honor and integrity had been irrevocably impugned. *Id.* at 606–07. But "all of this [wa]s no evidence that Bentley suffered mental anguish damages *in the amount of $7 million.*" *Id.* at 607 (emphasis added).

The court of appeals disregarded *Bentley* and later cases, which require evidence justifying the *amount* of mental anguish damages, by distinguishing between defamation and wrongful death. We are not convinced that this distinction makes a difference. *Bentley*, a defamation case, quotes *Saenz*, a personal injury case, at great length. *Bentley*, 94 S.W.3d at 606 (quoting *Saenz*, 925 S.W.2d at 614). Our precedent thus cannot support the notion that defamation cases are somehow unique. Nor do we see any valid basis on which to carve out special rules for appellate review of noneconomic damages in wrongful

11

death cases, as opposed to non-death injury cases or defamation cases. Though the magnitude of mental anguish may often be heightened in wrongful death cases, the jury's task is the same: "They must find an amount that, in the standard language of the jury charge, 'would fairly and reasonably compensate' for the loss." *Id.* A wrongful death case is no different in this regard.

All acknowledge the inherent difficulty in assigning a dollar value to the anguish and loss suffered by the grieving family of an accident victim, but this is what we ask juries to do. The nature of this undertaking—compensating people with money for emotional injuries that are difficult to monetize—is not fundamentally different when the emotional injuries are caused by a death rather than by defamation as in *Bentley* or by a non-fatal personal injury as in *Saenz*. In any factual context, including wrongful death, the approach we stated in *Saenz* and repeated in *Bentley* applies to the legal-sufficiency review of damages awarded for noneconomic injury:

> Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded. We disagree with the court of appeals that "translating mental anguish into dollars is necessarily an arbitrary process for which the jury is given no guidelines." *Fidelity & Guaranty Insurance Underwriters v. Saenz*, 865 S.W.2d 103, 114 (Tex. App.—Corpus Christi 1993). While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited. Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, "would fairly and reasonably compensate" for the loss. Compensation can only be for mental anguish that causes

12

> "substantial disruption in . . . daily routine" or "a high degree of mental pain and distress." *Parkway v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding. Reasonable compensation is no easier to determine than reasonable behavior—often it may be harder—but the law requires factfinders to determine both. And the law requires appellate courts to conduct a meaningful evidentiary review of those determinations.

*Bentley*, 94 S.W.3d at 606 (quoting *Saenz*, 925 S.W.2d at 614) (cleaned up).

**B.**

Holding that some evidence must justify the amount of noneconomic damages awarded does not fully answer the question, however. If we take seriously the notion that mental anguish and loss of companionship damages are meant to reasonably *compensate* surviving family members for their injuries—as our cases undoubtedly do[5]—then we must grapple with the difficulties that inevitably arise when courts attempt to evaluate the size of these compensatory awards.

"Compensation is the chief purpose of damages awards in tort cases." *J&D Towing, LLC v. Am. Alt. Ins. Corp.*, 478 S.W.3d 649, 655 (Tex. 2016); *see also id.* at 655 n.14 (quoting Fowler Harper et al., *Harper, James and Gray on Torts* § 25.1, at 574 (3d ed. 2007) ("The

---

[5] *E.g.*, *Moore*, 722 S.W.2d at 688. Mental anguish is "the emotional pain, torment, and suffering that the named plaintiff would, in reasonable probability, experience from the death of the family member." *Id.* Loss of companionship is the loss of "positive benefits flowing from the love, comfort, companionship, and society the named plaintiff would, in reasonable probability, experience if the decedent lived." *Id.*

cardinal principle of damages in Anglo–American law is that of *compensation* for the injury caused to the plaintiff by the defendant's breach of duty.")). Compensatory damages awards are meant to compensate victims, not to punish or deter tortfeasors. This basic premise of our civil justice system is no less true in a wrongful death case than in any other context. No matter what the compensatory damages are compensating for, they are supposed to be "[r]easonable and proper compensation . . . sufficient to place the plaintiff in the position in which he would have been absent the defendant's tortious act." *Id.* at 655.

Applying this simple-sounding rule to noneconomic injuries is far from simple. The unavoidable truth is that money cannot genuinely compensate for emotional trauma, whether or not tort law claims otherwise. Money's inability to truly compensate for mental anguish is most starkly demonstrated in a wrongful death case. How can money "place the plaintiff[s] in the position" they were in before Deol died?[6] Obviously it cannot. The economic loss in this case may be readily ascertainable, but the noneconomic harm transcends quantification entirely. At Deol's death, Jaswinder Chohan lost far more than just a source of financial support. She lost her husband.[7] Three children lost their father. Two parents were delivered the terrible news that they had outlived their son.

---

[6] *See Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 152 (Tex. 2014) ("[M]oney does not equate to peace of mind.").

[7] For one man's estimation of his own anguish upon the death of his wife, *see* C.S. Lewis, *A Grief Observed* (1961).

Any attempt to monetize the grief experienced by those whose loved ones die suddenly and prematurely will fail in its paltry attempt to compensate with money that which is priceless. The love we feel for those closest to us—and the pain we would feel at their passing—far exceeds any price that could ever be paid. Even as we establish legal standards in an attempt to promote rationality and non-arbitrariness in the damages awarded by courts, we are well aware of the insurmountable imperfection of any attempt to use money damages to compensate for the emotional injuries alleged in a wrongful death case. Imperfect justice is all that can be offered to grieving families who cannot truly be made whole, but it should be said that the entire enterprise of assigning dollar values to matters of the heart is exceedingly imperfect indeed.[8] Nevertheless, existing Texas law authorizes such recoveries, and our justice system must proceed in this realm, as in all others, on the basis of evidence and reason.

We must insist that every aspect of our legal system—including the way we compensate grieving families for the wrongful death of a loved one—yields rational and non-arbitrary results based on evidence

---

[8] Similar considerations have led jurisdictions like the State of New York to ban recovery for noneconomic losses in wrongful death cases altogether. *See Liff v. Schildkrout*, 49 N.Y.2d 622, 633–34 (N.Y. 1980) (noting that the New York wrongful death statute limits recovery to pecuniary injuries). Indeed, on the very day we heard oral arguments in this case, the Governor of New York vetoed a bill that would have authorized the recovery of noneconomic damages in wrongful death actions. Carolyn Gusoff, *Gov. Kathy Hochul Vetoes Grieving Families Act, But Families of Victims of Fatal Tragedies Aren't Giving Up*, CBS NEW YORK (Feb. 1, 2023), https://www.cbsnews.com/amp/newyork/news/grieving-families-act-vetoed-governor-hochul/.

and reason, to the extent possible. Any system that countenances the arbitrary "picking numbers out of a hat" approach to compensatory damages awards is not providing the rational process of law that we are obligated to provide, or at least to strive for.

As explained above, our precedents in *Parkway*, *Saenz*, *Bentley*, and later cases require legally sufficient "evidence of the nature, duration, and severity" of mental anguish to support both the *existence* and the *amount* of compensable loss. *Parkway*, 901 S.W.2d at 444; *Saenz*, 925 S.W.2d at 614; *Bentley*, 94 S.W.3d at 606. These decisions acknowledge the inherent indeterminacy of noneconomic awards and the discretion that must be afforded to juries asked to assign a dollar value to emotional injury. But they also make clear that the jury's discretion is by no means unlimited and that the *amount* awarded must be supported by *evidence*. The logic of these precedents applies with equal force to wrongful death cases.

The en banc majority did not look to these non-death cases for guidance because, in its view, "[d]eath is different." 615 S.W.3d at 304. While that statement is accurate in almost every conceivable application, it is not accurate when it comes to assessing damages for noneconomic injuries. No matter the source of the mental anguish or loss of companionship suffered, our precedent is clear that "there must be . . . evidence to justify the amount awarded" in compensatory damages, just as there must be evidence to support any other relief afforded by our judicial system. *Hancock*, 400 S.W.3d at 68.

16

## C.

Having established that (1) our precedent requires that the *amount* of damages awarded must be based on evidence and (2) emotional injuries are in their nature resistant to monetary quantification, we turn to the question of how a wrongful death plaintiff could establish the required connection between an emotional injury and an amount of damages.

### 1.

We begin with a few examples of how not to do so. During closing argument, counsel for Vasquez and Perales (other decedents) attempted to support the large request for noneconomic damages using a tactic that some amici refer to as "unsubstantiated anchoring."[9] We understand unsubstantiated anchoring to be a tactic whereby attorneys suggest damages amounts by reference to objects or values with no rational connection to the facts of the case. Analogies employed by counsel in this case included a $71 million Boeing F-18 fighter jet and a $186 million painting by Mark Rothko.

Of course, the cost of a fighter jet, the auction price of a coveted painting, or any other expensive comparator are all equally flawed analogies. After learning that a particular aircraft or painting sells for many millions of dollars, jurors are no closer to gaining a sense of how to compensate the family for their injuries. The self-evident purpose of these anchors, however, is to get jurors to think about the appropriate damages award on a magnitude similar to the numbers offered, despite

---

[9] Brief for Am. Prop. Cas. Ins. Ass'n, Ins. Council of Tex., and Nat'l Ass'n of Mut. Ins. Cos. as Amici Curiae in Support of Petitioners, at 26–27.

the lack of any rational connection between reasonable compensation and the anchors suggested. Unsubstantiated anchors like those employed here have nothing to do with the emotional injuries suffered by the plaintiff and cannot rationally connect the extent of the injuries to the amount awarded.

Decedents' counsel offered these examples to the jury with the stated purpose of helping them "place a monetary value on human lives." That statement misunderstands the task a jury faces when asked to award damages for mental anguish or loss of companionship. Such awards are not meant to place a value on human life, which would be an even more nebulous and speculative task than monetizing mental anguish and loss of companionship. Unsubstantiated anchors introduced as a way to assist a jury in "valuing a human life" are not the type of information a jury can rightfully rely on when crafting a verdict. And on appellate review, such suggestions are of no assistance in rationally explaining why the amount of noneconomic damages awarded reasonably compensates the decedent's family.

Another unsubstantiated anchor offered in this case vividly exemplifies the potential for such numbers to improperly influence verdicts. After referencing expensive paintings and military aircraft, counsel for Vasquez and Perales urged the jury to give defendants their "two cents worth" for every one of the 650 million miles that New Prime's trucks drove during the year of the accident. The exact request was "[t]wo cents worth for each [decedent]; six cents a mile for the six hundred and fifty [million] miles . . . they traveled in the year that they took these people's lives." Counsel argued that "for four years I've been

18

trying to give this company and their lawyers my two cents worth[;] . . . [f]or four years I've been trying and they won't listen to me." He then asked the jury to give New Prime their "two cents worth" instead. The unmistakable purpose of this argument is to suggest that New Prime can afford a large award and that it should be punished for denying Chohan and her family justice for Deol's death. But punitive damages are not at issue here; only compensatory damages are, and the "two cents a mile" argument has nothing to do with compensation.

This improper argument may have influenced the jury. Accounting for three decedents, the "two cents a mile" calculation yields $39 million in damages. The combined final jury verdict was $38.8 million, so it is not difficult to conclude that the improper argument influenced the result. This is especially the case when we are given no other explanation for the size of the award. The only discernible basis for the amount awarded in this case that appears from the evidence or the argument of counsel is the "two cents a mile" suggestion, which matches the amount awarded within one-half of one percent.

Chohan urges that the Court should not consider these comments because they were made by counsel for Vasquez and Perales, not her own. We do not find that distinction convincing. The parties tried their wrongful death claims simultaneously to the same jury, which heard closing argument from both attorneys before deliberation. As a result, the improper argument might very well have affected the jury's deliberations as to all three decedents. If the jury's total award was influenced by the unsubstantiated "two cents a mile" suggestion, then improper considerations influenced the amount awarded to Deol's

19

family just as much as they influenced the amount awarded to the Vasquez and Perales plaintiffs.

The Texas Rules of Civil Procedure speak clearly to this issue. "Counsel shall be required to confine the argument strictly to the evidence and to the arguments of opposing counsel." TEX. R. CIV. P. 269(e). It should go without saying that the cost of a painting, a military aircraft, or a percentage of a company's revenue are not "evidence" to which "counsel shall be required to confine the argument." Courts have an obligation to prevent improper jury argument and "will not be required to wait for objections to be made when the rules as to arguments are violated." TEX. R. CIV. P. 269(g). The trial court should have done so in response to the unsubstantiated anchors suggested by counsel.

Chohan's counsel asked the jury to use Deol's economic damages as a reference for both mental anguish and loss of companionship. Petitioners and some amici embrace the use of economic damages as a benchmark for noneconomic damages, and the courts of appeals take a mixed approach to the issue.[10] The usefulness of such ratios will vary

---

[10] *Compare JNM Express, LLC v. Lozano*, 627 S.W.3d 682, 701–02 (Tex. App.—Corpus Christi–Edinburg 2021, pet. pending) (entertaining an argument that "the ratio of non-economic damages to economic damages" was "approximately 17:1," but ultimately tossing it for inadequate briefing), *FTS Int'l Servs., LLC v. Patterson*, No. 12-19-00040-CV, 2020 WL 5047913, at *1 (Tex. App.—Tyler Aug. 26, 2020), *pet. granted, cause remanded*, No. 20-0795, 2023 WL 2358215 (Tex. Jan. 27, 2023), *Lane v. Martinez*, 494 S.W.3d 339, 351 (Tex. App.—Eastland 2015, no pet.) ("This large ratio of non-pecuniary damages to pecuniary damages . . . lead[s] us to the conclusion that the jury's awards of non-pecuniary damages [are] not supported by factually sufficient evidence."), *and Hous. Livestock Show and Rodeo, Inc. v. Hamrick*, 125 S.W.3d

depending on the nature of the case. In wrongful death cases, however, we reject any requirement that the ratio between economic and noneconomic damages must be considered. The emotional trauma and loss experienced by the decedent's loved ones is different in kind from any lost income the family suffers because of the death. To suggest that greater pecuniary loss necessarily justifies greater noneconomic damages is to suggest that the families of a well-paid decedent suffer more grief and pain than the families of those with less income. Our consciences should indeed be shocked by such a suggestion. The severity of mental anguish and loss of companionship felt by surviving family members does not correlate with economic status. If—as the law demands—noneconomic damages are calculated to compensate a decedent's family members for their suffering, we cannot endorse a rule under which a wealthier family can recover more mental anguish

555, 581 n.24 (Tex. App.—Austin 2003, no pet.), *with Alonzo v. John*, 647 S.W.3d 764, 778–79 (Tex. App.—Houston [14th Dist.] 2022, pet. filed) (expressing skepticism about using the ratio of economic and noneconomic damages and upholding an award as supported by sufficient evidence despite a 24:1 disparity between the two), *Emerson Elec. Co. v. Johnson*, 601 S.W.3d 813, 844 n.18 (Tex. App.—Fort Worth 2018), *aff'd on other grounds by* 627 S.W.3d 197 (Tex. 2021) (concluding that the court need not consider the ratio of economic and noneconomic damages awards, but nevertheless concluding that the ratio was not excessive), *and Simmons v. Bisland*, No. 03-08-00141-CV, 2009 WL 961522, at *7 (Tex. App.—Austin April 9, 2009, pet. denied) ("The applicable standard of review requires us to uphold non-economic damage awards that are supported by the evidence, regardless of any ratio of non-economic damages to economic damages.").

damages than another family could *simply because* the wealthier decedent stood to earn more during his life.[11]

This is not to say that economic damages can never be considered when assessing noneconomic damages. There are certainly circumstances in which some types of economic damages might correlate with noneconomic damages. For example, the family of a decedent who suffers for an extended time in the hospital before passing away might suffer more mental anguish due to the strain of dealing with medical bills and insurance hassles while coping with the death of a loved one. In those circumstances, economic damages would also be higher because of the medical expenses associated with a long hospital stay. But the possibility that economic and noneconomic damages may correlate or inform one another in certain situations does not mean that they are necessarily connected in all cases or that the ratio between the two is always a useful tool. Like other unsubstantiated anchors, unexamined use of the ratio between economic and noneconomic damages—without case-specific reasons why such analysis is suitable—cannot provide the required rational connection between the injuries suffered and the amount awarded.

## 2.

If unsubstantiated anchors and unexamined ratios are not useful tools, then how can a party discharge its obligation to support an amount

---

[11] Additionally, we agree with the dissent below that ratios between economic and noneconomic damages are particularly ill-suited for a wrongful death claim "because it is brought by the surviving family members, not the decedent whose primary economic loss is captured in a separate claim." 615 S.W.3d at 319 (Schenck, J., concurring in part and dissenting in part).

of noneconomic damages with evidence?  To begin with, just as evidence of the *existence* of mental anguish damages generally must establish the "nature, duration, and severity" of the anguish suffered, *Guerra*, 348 S.W.3d at 231, the same kind of evidence—of "nature, duration, and severity"—will naturally also be relevant to the *amount* awarded.

In some cases, there may be direct evidence supporting quantification of an amount of damages, such as evidence of the likely financial consequences of severe emotional disruption in the plaintiff's life.  Or there may be evidence that some amount of money would enable the plaintiff to better deal with grief or restore his emotional health.  While money itself cannot alleviate grief or truly compensate for emotional trauma, it may be that money can provide access to all kinds of things that may help the person who has endured such an experience.

We do not offer these examples to suggest that in all cases there must be direct evidence of a quantifiable amount of damages.  In other words, the requirement that some evidence support the amount of damages for emotional injury is not a requirement of precise quantification or a requirement that a particular type of evidence must always be proffered.  It is instead merely a requirement that the amount of damages must have a rational basis grounded in the evidence.  This requirement flows ineluctably from our prior holding that "[t]here must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding." *Bentley*, 94 S.W.3d at 606 (quoting *Saenz*, 925 S.W.2d at 614).  As with any evidentiary-sufficiency requirement, parties defending an award of damages cannot just assert that the amount justifies itself.  Instead,

23

when the record lacks evidence directly supporting the amount found, parties and reviewing courts must explore whether there is any other rational explanation of *how* the evidence supports the finding. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 592 n.1 (Tex. 1992) (framing the sufficiency inquiry as including "whether the evidence offered has a tendency to prove the existence of a material fact"). As we held in *Bentley* and *Saenz*, the amount of a noneconomic damages award is subject to these conventional requirements of "meaningful evidentiary review," just like "any other jury finding." *Bentley*, 94 S.W.3d at 606 (quoting *Saenz*, 925 S.W.2d at 614).

The required rational basis for the award may come from evidence suggesting a quantifiable amount of damages, such as testimony about the potential financial consequences of severe emotional trauma. Or the rational basis may be revealed by lawyer argument rationally connecting the amount sought—or on appeal, the amount awarded—to the evidence. *Accord Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 675 (Tex. 2004) (observing in the context of constitutional law that a "rational basis" for government action should be found "if one can be conceived," whether or not government officials had that basis in mind when they acted). We will not speculate here about all the permissible ways in which parties may demonstrate that a rational connection between the evidence and the amount awarded exists or is lacking. But merely asserting, without rational explanation, that any amount picked by the jury is reasonable compensation simply because a properly instructed jury picked the number is to argue that a jury may "simply pick a number and put it in the blank." *Saenz,* 925 S.W.2d at

614. That is exactly what we have said must not be done. *Id*. Such an arbitrary approach to damages is no more defensible in a wrongful death case than in any other case.

If awarding and reviewing noneconomic damages is to be a rational and non-arbitrary exercise, as we surely must insist that it be, then courts and jurors alike should be told *why* a given amount of damages, or a range of amounts, would be reasonable and just compensation. Mathematical precision is by no means required, but it is not enough for the plaintiff or his attorney merely to assert, without rational explanation, that a given amount or a given range is reasonable and just. We do not doubt that those who argue for such damages to juries and who seek to uphold them on appeal genuinely believe the amounts they seek and obtain are reasonable and just compensation for the injuries suffered. But one party's genuine belief is no rational basis for a judgment. There must be a *reason given* for why the belief is valid, a *reason given* for why the amount sought or obtained is reasonable and just. And it must be a rational reason grounded in the evidence.[12]

---

[12] Although neither party advocates for a comparative method under which the size of damages awards can be justified based on the damages previously awarded in factually similar cases, several amici suggest such an approach. We do not foreclose the possibility that comparison to other cases may play some role in a plaintiff's effort to establish that a given amount of noneconomic damages is reasonable and just compensation rationally grounded in the evidence. We have in the past invoked similar reasoning. *See Anderson*, 550 S.W.3d at 620 ("The jury's $400,000 award appears to be excessive compared to awards in cases involving similar or more egregious behavior . . . ."). We will not endeavor here to define the permissible uses of verdict comparisons.

If the amount sought is genuinely thought to be reasonable and just compensation, then there should be an articulable reason why that is so. An attorney asking a jury to award that amount in damages should be expected to articulate the *reason why* the amount sought is reasonable and just, so the jury can rationally decide whether it agrees. And on appeal, if the reasons offered in justification of the amount awarded are rational and do not partake of prohibited motives, courts should defer to the jury's verdict. Again, we do not place any limits, in this opinion, on the reasons by which a plaintiff might justify the amount he seeks or the amount he has been awarded. We hold only that a rational reason, grounded in the evidence, must be given by the plaintiff, whose burden it is to prove the damages. Only then can juries and judges rationally assess whether the amount is reasonable and just compensation for the injuries suffered.[13]

In sum, to survive a legal-sufficiency challenge to an award of noneconomic damages, a wrongful death plaintiff should bear the burden of demonstrating both (1) the existence of compensable mental

_____

[13] Some amici support a standard that asks what "a reasonable person could possibly estimate as fair compensation." *Waste Mgmt. of Tex., Inc.*, 434 S.W.3d at 153 (quoting RESTATEMENT (SECOND) OF TORTS § 905 cmt. i). The Fifth Circuit has characterized Texas law as employing a similar standard. *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 365 (5th Cir. 2019). Because a juror acting reasonably could only award a specific amount of money if there was a rational connection between that amount and the evidence adduced at trial, we understand both our approach and the Restatement's as asking essentially the same question. The question is "what verdict is within the bounds of reasonable inference from the evidence." *Miller v. Md. Cas. Co.*, 40 F.2d 463, 465 (2d Cir. 1930) (Learned Hand, J.). It is the plaintiff's responsibility, as the party with the burden of proof, to articulate the "reasonable inference" connecting the size of the verdict and the evidence.

anguish or loss of companionship and (2) a rational connection, grounded in the evidence, between the injuries suffered and the amount awarded.

**D.**

With these standards in mind, we examine the proceedings below. To determine whether the award was excessive, the en banc court of appeals employed essentially a two-step framework.

First, it gave a detailed account of Chohan's trial testimony indicating that she, her three children, and Deol's parents all had a close relationship with Deol during his life and were deeply grieved by his passing. 615 S.W.3d at 309–14. The unenviable task of explaining how she and each of her family members had been affected by Deol's death fell to Chohan alone. Her testimony is thorough, saddening, and as the en banc majority notes, accounts for nearly fifty pages of a lengthy reporter's record. *Id.* at 310. As to her own relationship with Deol, she testified that they shared a "very, very close" relationship, and he was her "best friend." The night of the accident was particularly traumatic for her, and she described the moment that she heard the news of his passing as "the saddest moment of her life." She began taking antidepressants, and the loss of Deol's support meant she had to relocate the family, which created additional disruption and discomfort in all of their lives, including hers. She finds herself particularly saddened by Deol's passing at milestones in their children's lives.

As to the children, both sons quite understandably reacted emotionally to their father's death. Both were very attached to him. Since the time of the accident, the older son, who used to be happy and

27

outgoing, is now quiet and keeps to himself. The younger son is less active than before and has gained weight. As for the daughter, who was only seven months old at Deol's death, she sees pictures of her father around the house and asks when he is coming home.

Finally, Chohan testified that Deol was very close to his parents, who lived with them. They enjoyed spending time cooking and gardening together. Since his death, his mother cries several times a day. Though Deol's father is more reserved in his grief, Chohan testified that the family's entire home life has changed for the worse and that everyone is greatly saddened by Deol's passing.

After surveying this evidence, the court of appeals turned to the second step of its review. Noting that the jury was properly instructed on the definitions of mental anguish and loss of companionship and the types of evidence relevant to each, *id.* at 311–12, the court concluded that the verdict displayed no indication that the award was motivated by "passion, prejudice, sympathy, or other circumstances not in evidence," *id.* at 314. Nor was the award "flagrantly outrageous, extravagant, [or] so excessive that it shock[ed] the judicial conscience." *Id.* With those observations, it began and ended its analysis, affirming the verdict as sufficiently supported by the evidence. *Id.*

That approach is not so much wrong as it is incomplete. While we agree with both the majority and Justice Schenck's dissent that Chohan's testimony is sufficient evidence that Deol's family suffered compensable mental anguish and a loss of companionship,[14] the

---

[14] Gregory and New Prime concede as much. Pet. Br. on the Merits, at 38–39.

testimony is no evidence, standing on its own, of the *amount* of damages incurred on account of that suffering. Crucially, plaintiffs' counsel at no point in these proceedings has attempted to proffer a rational argument justifying either the amount sought or the amount awarded. At trial, the only arguments provided to justify an amount of damages were impermissible appeals to irrelevant considerations, such as fighter jets and New Prime's total miles driven. *See supra* at 17–20. On appeal, the plaintiffs' suggested approach is that as long as the jury is properly instructed and no improper motive is evident, then the jury may essentially "pick a number and put it in the blank." *Saenz*, 925 S.W.2d at 614. But that is precisely the kind of arbitrariness our precedent attempts to avoid by insisting on "evidence to justify the amount awarded." *Id*.

Chohan's testimony gave the jury much to work with when deliberating the first question related to damages: their existence. As we said in *Moore*, proof of a "family relationship constitutes some evidence" of mental anguish. 722 S.W.2d at 686. Chohan's testimony, in addition to proving the family relationships, provides an explanation for how each member of the family grieved Deol's loss. It gives examples of appreciable ways in which each of their lives was made worse by his passing. But it does not give any indication of what amount of damages would be enough "to indemnify the injured [plaintiffs] for the loss suffered."[15] After hearing her testimony, no reasonable jury, however attentive, properly instructed, and well-intentioned, would be any closer to rationally assigning a monetary value to the losses she described.

---

[15] *Compensatory Damages*, BLACK'S LAW DICTIONARY (11th ed. 2019).

While Chohan's testimony satisfies *Parkway's* requirement that a plaintiff introduce legally sufficient "nature, duration, and severity" evidence, 901 S.W.2d at 444, it does not satisfy *Saenz's* requirement that "there must also be some evidence to justify the amount awarded." 925 S.W.2d at 614.

Nor does it suffice to simply conclude, as the en banc majority did, that the result neither shocks the conscience nor arises from bias or prejudice. We said almost 140 years ago that:

> What shocks the conscience or manifests passion or prejudice in the jury are tests too elastic for practical use in the great majority of cases. They readily dispose of rare extremes. But the cases which need a rule are those which press the bounds of reason without transgressing; they disturb, but do not shock, the conscience; voice a severe, but not necessarily an enraged or prejudiced, jury.

*Dorsey*, 18 S.W. at 445. The "shocks the conscience" standard is inherently subjective because the consciences of appellate judges will surely differ in their assessment of damages awards. As we said in *Bentley*, a court of appeals' factual-sufficiency review of the amount of damages for excessiveness—which is where the "shocks the conscience" standard has been employed—does not "displace[] [the court of appeals'] obligation, and ours, to determine whether there is any evidence at all of the *amount* of damages determined by the jury." 94 S.W.3d at 606. Applying only the vague and subjective "shocks the conscience" standard is therefore not enough.[16] Whether or not it is reversible error to "shock

---

[16] Whatever the limited value of the "shocks the conscience" inquiry, if a reviewing court concludes that a jury's verdict was motivated by improper passion, prejudice, or a desire to punish a defendant, this remains a separate

the conscience" of an appellate judge, it is error to allow a verdict to stand when no rational basis for the verdict's amount is proffered, as is the case here.

The court of appeals detailed Chohan's testimony and then stated that its conscience was not shocked. But it made no attempt to reason from the testimony to an explanation for why $15 million reasonably compensates Deol's family for the many injuries Chohan described. Nor did the plaintiffs' counsel assist in that regard. Indeed, the only argument offered at any point in this case that could explain the size of this award is the impermissible "two cents a mile" exhortation by counsel for Vasquez and Perales. No other explanation for the award's size has been proffered. Because no rational connection has been proffered between the amount awarded and the evidence of the "nature, duration, and severity" of the noneconomic damages suffered by Deol's family—and no such connection is apparent from the record—we must conclude that no evidence supports the amount awarded. The award of noneconomic damages must therefore be reversed.

When sufficient evidence exists to support the existence of damages but not the amount awarded, we reverse and remand. *See ERI*

---

basis for reversal, *even if* there is otherwise evidence in the record that meets the legal standards articulated here. Texas courts often say that they "will set aside the verdict only where the record clearly indicates that the award was based on passion, prejudice, or improper motive, or is so excessive so as to shock the conscience." *E.g.*, *Sanchez v. Balderrama*, 546 S.W.3d 230, 237 (Tex. App.—El Paso 2017, no pet.). Though our decisions in *Parkway*, *Saenz*, and *Bentley* augment that standard of review, they do not eliminate it. "Passion, prejudice, or improper motive" remains an independent basis for reversal.

*Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 882 (Tex. 2010).[17] Typically, in such a case, we would remand to the court of appeals to consider a remittitur. *Id.* But because in this case we also remand for a new trial due to the responsible-third-party issue, we will remand the entire case to the trial court for a new trial.

## III.

Finally, we consider the responsible-third-party issue. Before trial, Gregory and New Prime sought to designate several responsible third parties, including ATG, Danfreight, CDO, and each of their drivers. At the request of Deol's family, the trial court struck the designations before trial and later reaffirmed its ruling after presentation of the evidence.[18]

In this Court, the defendants complain only about the exclusion of ATG as a responsible third party. Their theory as to ATG's responsibility is as follows. Though the New Prime truck was blocking all of the left lane and most of the right lane of traffic, the two trucks

---

[17] *See also Swinnea*, 318 S.W.3d at 882 ("We also hold that while legally sufficient evidence does not exist to prove the lost profits awarded by the trial court, legally sufficient evidence does exist to prove some reasonably certain amount of lost profits. We therefore also reverse the portion of the court of appeals' judgment that ERI take nothing on its claims for lost profit damages and punitive damages and remand the case to the court of appeals to consider a remittitur, as well as any other remaining issues, before remanding the case to the trial court.").

[18] In their briefing before this Court on the responsible-third-party issue, both petitioners and respondents engage with the full extent of the evidence presented at trial. Thus, they ask this Court to review the trial court's second, post-trial ruling on the issue, rather than the initial pre-trial ruling. We decide the issue as presented, by applying the statutorily dictated responsible-third-party standard to the trial evidence.

that encountered the crash site before ATG were able to successfully navigate around the hazard to the right. It was not until the ATG truck arrived on the scene, tipped over, and blocked all remaining clearance on the right that the accident became unavoidable for the approaching vehicles. When the Vasquez van arrived soon after, it had no way to avoid the obstacles in front of it. The defendants contend that ATG's driver bore much of the responsibility for the fact that the accident was unavoidable for approaching vehicles, including the Vasquez van and the ensuing vehicles that caused the Vasquez van to crush Deol. They reason that if Gregory was responsible for Deol's death because her negligence created an obstructed road ultimately causing a later collision that killed Deol, then ATG's driver must likewise be at least partly responsible because the later, deadly collision was not unavoidable until the ATG driver's negligence resulted in a total obstruction of the road.[19]

For her part, Chohan contends that ATG was properly excluded as a responsible third party because the defendants produced no

---

[19] Chohan contends that Gregory and New Prime waived this objection because, at the charge conference, they objected to ATG's exclusion from the jury questions pertaining to the Vasquez and Perales parties but made no objection about the questions directed at Deol. We disagree. Gregory and New Prime designated ATG as a responsible third party, opposed the plaintiffs' motion to strike the designation on the record, moved for reconsideration multiple times after the first attempt was unsuccessful, and obtained a ruling on the record. There are six pages of the reporter's record dedicated to back-and-forth argument on this point. The Texas Rules of Appellate Procedure require that the record reflect a timely objection stating the grounds for the ruling sought and a ruling on the request. TEX. R. APP. P. 33.1(a). Gregory and New Prime's preservation efforts satisfy those procedural requirements.

evidence as to (1) duty,[20] (2) negligence, or (3) causation. As to negligence, Chohan contends that, at most, the defendants point to evidence that the ATG driver "steered aggressively to the right" and spun out, which, given the circumstances created by Gregory's prior jackknife of the New Prime truck, was eminently understandable. Chohan thus contends that the defendants did not introduce sufficient evidence of negligence on the part of ATG. As to causation, Chohan argues that ATG played no part in making the crashes that led to Deol's death more likely because the New Prime truck was the but-for cause of the Vasquez van's crash. Had the New Prime truck not been jackknifed in the left lane, Chohan contends, the Vasquez van could have safely avoided the overturned ATG truck by travelling in the left lane.

The court of appeals affirmed the trial court's decision to exclude ATG, reasoning that the Vasquez van's involvement in the crash was solely attributable to Gregory's negligence. 615 S.W.3d at 299.

"A defendant may seek to designate a person as a responsible third party." TEX. CIV. PRAC. & REM. CODE § 33.004(a). "After adequate time for discovery, a party may move to strike . . . on the ground that there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or damage." *Id.* § 33.004(l). Then, the burden shifts to the designating party to "produce[] sufficient

---

[20] We do not consider this objection in depth because the record contains a police report demonstrating that the driver of the truck was also the owner of ATG Transportation. That is some evidence implicating the entity. Chohan's negligence and causation objections are more substantial, and we give them lengthier consideration.

evidence to raise a genuine issue of fact regarding the designated person's responsibility for the claimant's injury or damage." *Id.*

"Consistent with the statute's language, [the] courts of appeals have described the standard of review as mirroring a no-evidence summary judgment" under Texas Rule of Civil Procedure 166a(i). *In re Eagleridge Operating, LLC*, 642 S.W.3d 518, 525–26 (Tex. 2022) (collecting cases).[21] We agree. The similarity between the statutory responsible-third-party standard and the no-evidence summary judgment standard is obvious. *See City of Keller v. Wilson*, 168 S.W.3d 802, 825 (Tex. 2005) ("The standards for taking any case from the jury should be the same, no matter what motion is used."). Regardless of the procedural context, to ask "[w]hether the proof establishes as a matter of law that there is no genuine issue of fact" is to ask a question of law, which means that review of the denial of a responsible-third-party designation is de novo. *Ham v. Equity Residential Prop. Mgmt. Servs. Corp.*, 315 S.W.3d 627, 631 (Tex. App.—Dallas 2010, pet. denied).

---

[21] *Compare* TEX. CIV. PRAC. & REM. CODE § 33.004(l) ("After adequate time for discovery, a party may move to strike the designation of a responsible third party *on the ground that there is no evidence* that the designated person is responsible for any portion of the claimant's alleged injury or damage. The court shall grant the motion to strike unless a defendant produces *sufficient evidence to raise a genuine issue of fact* regarding the designated person's responsibility for the claimant's injury or damage.") (emphasis added), *with* TEX. R. CIV. P. 166a(i) ("After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment *on the ground that there is no evidence* of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces *summary judgment evidence raising a genuine issue of material fact*.") (emphasis added).

35

We cannot agree with the courts below that "there is no evidence that [ATG] is responsible for any portion of [Deol's family's] injury." TEX. CIV. PRAC. & REM. CODE § 33.004(l). Instead, the evidence of the ATG driver's role in bringing about the dangerous conditions that caused the deadly collision would have permitted a reasonable jury to assign partial responsibility to ATG for Deol's death.

To begin with, there was evidence that the ATG driver's negligence—and not solely the negligence of Gregory—resulted in a total obstruction of the road. An expert witness for the plaintiffs testified that the ATG driver "steered aggressively to the right" with "well beyond the normal steering input that you would use," which "led to the [ATG] tractor trailer spinning out and then ultimately rolling over onto its left side." That same witness agreed that it would be "fair to say that any motor vehicle reacting to [the condition of the roadway] that lost traction, just like Ms. Gregory had done, was also failing to properly control their speed." A surviving passenger from the Vasquez van testified that, right before the ATG truck crashed, it "went straight up in the air like it was [a] catapult. And you could actually see the bottom of the trailer and the axles underneath as it went up." Other passengers from the van provided a similar version of events. Additionally, the ATG truck was the only truck to overturn during the entire course of events. Two other trucks had previously encountered the jackknifed New Prime truck, and unlike the ATG truck, both were able to steer clear of it on the right.

From this testimony, a reasonable jury could have concluded that the ATG driver negligently operated his vehicle, either by driving it too

36

fast in inclement conditions such that he could not avoid the crash to the right, as other trucks did, or by overcorrecting his vehicle in an attempt to steer to the right.

Chohan's argument in both the trial court and the court of appeals focused less on the ATG driver's negligence and more on causation. The court of appeals affirmed solely on that basis, reasoning that Gregory's truck, not the ATG truck, was solely responsible for causing the Vasquez van to crash because:

> The evidence showed that, but for Gregory's vehicle blocking the road with no hazard warning signal, Vasquez would have had ample space and time to stop his vehicle and get off the road, notwithstanding the location of the ATG Transportation truck. Because it was due to Gregory's actions that the Vasquez van was placed in the position it was before being pushed over Deol, the evidence is insufficient to establish that any act or omission by ATG Transportation was a substantial factor in causing Deol's death.

615 S.W.3d at 299.

There are two problems with this reasoning. First, while it is true that Gregory's truck blocked the Vasquez van from travelling safely along the highway in the left lane (and in most of the right lane), it is just as true that the ATG truck blocked the Vasquez van from avoiding the accident on the right—as two earlier large trucks had done. Before the ATG truck arrived on the scene, two other trucks had safely passed the New Prime truck on the right, avoiding any serious accident. But after the ATG truck fell and blocked the right side of the road, any possibility that later drivers who approached the accident could safely navigate around the accident was eliminated. When the Vasquez van

37

arrived shortly thereafter, its driver had no choice but to crash into either the New Prime truck on the left or the ATG truck on the right. Indeed, it was only because the ATG truck flipped over in front of the Vasquez van that its driver was compelled to move into the left lane to begin with. We cannot know whether the Vasquez van and the later vehicles would have crashed into the New Prime truck had the fallen ATG truck not blocked the rest of the road, but there can be little doubt on this record that the total obstruction of the road increased the likelihood of later collisions, including the one that killed Deol.

Second, even if it were true that the New Prime truck was the sole cause of the Vasquez van's crash, the Vasquez van's crash did not kill Deol. The evidence indicated that later collisions by subsequent vehicles pushed the van onto Deol. Thus, it is not enough to say, as the court of appeals did, that "it was due to Gregory's actions that the Vasquez van was placed in the position it was before being pushed over Deol." *Id.* at 299. It was not the van's presence that killed Deol; it was instead the van's being "pushed over Deol" by later collisions. Regardless of what caused the Vasquez van's presence at the scene, a reasonable juror could have concluded that the later, deadly collisions were made more likely by the total obstruction of the road and that the total obstruction was caused, in part, by the ATG driver's negligence.

The court of appeals was correct to conclude that "but for Gregory's vehicle blocking the road," "Vasquez would have had ample space and time to . . . get off the road." *Id.* But the mere fact that one person's behavior is a but-for cause of an injury does not mean that another's behavior is not also a substantial factor in causing the same

38

injury. Gregory's negligent operation of her truck was the first cause in a series of events that led to a tragedy. Although the accident would not have occurred but for Gregory's actions, a reasonable jury could have concluded that the ATG driver's actions turned an already dangerous situation into a deadlier one by closing off the ability of drivers approaching the scene to avoid a crash.

For these reasons, there was "sufficient evidence to raise a genuine issue of fact regarding [ATG's] responsibility" for Deol's death. TEX. CIV. PRAC. & REM. CODE § 33.004(l). Prohibiting the jury from considering ATG's partial responsibility for Deol's death was harmful error because litigants have a "significant and substantive right to allow the fact finder to determine the proportionate responsibility of all responsible parties." *In re Coppola*, 535 S.W.3d 506, 509 (Tex. 2017). A new trial is therefore required. *See id.* ("Allowing a case to proceed to trial despite erroneous denial of a responsible-third-party designation would skew the proceedings and potentially affect the outcome of the litigation") (cleaned up).

## IV.

The judgment of the court of appeals is reversed, and the case is remanded to the trial court for a new trial on all remaining issues between the remaining parties.

James D. Blacklock
Justice

**OPINION DELIVERED:** June 16, 2023

39